WOODMEN OF THE WORLD LIFE INSURANCE SOCIETY v. SEARS, ROEBUCK AND COMPANY AND ANOTHER.
G. P. SCHOENFELDER, APPELLANT.

200 N. W. 2d 181.

July 14, 1972—No. 43119.

---

[3] See, Note, 49 Minn. L. Rev. 1154; Hagglund & Arthur, *Dram Shop Law in Minnesota*, 28 Bench and Bar of Minn., Feb. 1972, p. 17.

*Faegre & Benson, Gordon G. Busdicker,* and *Arthur L. Doten,* for appellant.

*Schacht, Kerr & Schacht* and *George R. Kerr,* for respondent plaintiff.

*O'Connor, Green, Thomas, Walters & Kelly, Frederick W. Thomas,* and *Frank J. Walz,* for respondent Sears, Roebuck and Company.

Heard before Knutson, C. J., and Murphy, Otis, and Peterson, JJ.

PETERSON, JUSTICE.

Defendant G. P. Schoenfelder, owner of real estate developed as a shopping center complex in Rochester, Minnesota, was the mortgagor (by assignment) in a mortgage on the real estate to plaintiff, Woodmen of the World Life Insurance Society (hereafter Woodmen), and the lessor (by assignment) in a long term lease of a major segment of the center to defendant Sears, Roe-

buck and Co. (hereafter Sears). By agreement made contemporaneous with execution of the mortgage, the Sears lease, which obligated the lessor to pay the real estate taxes, was assigned to Woodmen as additional security for its loan. Schoenfelder defaulted in payment of the mortgage note and, in addition, failed to pay the real estate taxes for that and prior years. Woodmen foreclosed upon the mortgage security and, as the sole bidder at the foreclosure sale, purchased the security property. Woodmen was thereafter appointed receiver to collect the rents payable under the Sears lease and to pay current and delinquent taxes on the premises during the statutory period of redemption. The propriety of that order is the subject of this appeal.

This general introductory statement must be augmented by a more detailed statement of the complex financing arrangement among the parties to fully understand the contested issues. Crossroads Center, Inc., which was the corporate alter ego for defendant Schoenfelder, undertook construction of the shopping center complex in 1961. He caused the corporation to negotiate the Sears lease in 1961, the lease contemplating the construction of a building which Sears agreed to occupy for a period of 25 years at a rental based upon a percentage of sales. By the terms of the lease, the lessor expressly agreed to pay all taxes and assessments against the leased premises when due and, upon the lessor's failure to do so, the lessee at its option could either terminate the lease or itself pay the taxes or assessments subject to reimbursement.[1] The corporation, as contemplated in the lease

---

[1] Paragraph 20 of the lease provided: "Landlord hereby expressly agrees to pay all taxes and assessments of every nature, kind and description levied and assessed against the demised premises as the same become due from time to time during the term of this Lease, and at Landlord's expense to keep said demised premises insured at all times during the term hereof against destruction or damage by fire or tornado for Eighty Per Cent (80%) of the full insurable value thereof, said insurance, in the event of loss during said term or any renewal thereof, to be payable to Landlord and Tenant as their respective interests appear under Article 23 hereinafter provided. If Landlord fails to

agreement, sold the property to Lutheran Brotherhood, a financial institution, in 1963, subject to the Sears lease, seemingly as an interim financing arrangement.

Thereafter, in 1966, Schoenfelder, as an individual, reacquired the property from Lutheran Brotherhood by means of a loan of $1,500,000. In contemplation of the transaction and as an inducement for Woodmen to provide the permanent financing in that amount, Lutheran Brotherhood and Sears renegotiated the lease agreement, reciting the intended transfer to Schoenfelder and the intended loan to Schoenfelder in that amount. The lease modification agreement provided for rental payment according to a new schedule of percentages of sales and, in addition, provided that if the new lender were subsequently to foreclose its mortgage and obtain title Sears would pay as rent the greater of either the sum determined by the new schedule of percentages of sales or, in the alternative, the sum necessary to service the foreclosed mortgage, to pay taxes, assessments, and insurance, and to pay the cost of all obligations of the lessor under the lease other than the obligation to make repairs.

Contemporaneous with the execution of the lease modification agreement, Lutheran Brotherhood transferred the property, subject to the modified lease, to Norse Properties, Inc. (apparently a corporation in which Schoenfelder had an interest), taking back a promissory note and mortgage of $1,500,000 and an assignment of the Sears lease. Norse promptly transferred

pay said taxes and assessments, as aforesaid, and if by reason thereof Tenant's property becomes subject to seizure, or Tenant's peaceable possession under this Lease is threatened, then unless Landlord immediately pay such taxes and assessment upon being requested to do so by Tenant, Tenant shall have the right, without affecting any other remedies it may have by reason thereof, to terminate this Lease, or Tenant, at Tenant's sole option, may pay said taxes or assessments, in which latter event Landlord shall, upon demand, reimburse Tenant for such payment, and until Tenant is so reimbursed, Tenant shall have the right to deduct said payment from the installments of rental next thereafter becoming due hereunder."

the property to Schoenfelder, subject to the mortgage and the modified lease; and Lutheran Brotherhood contemporaneously assigned the note, mortgage, and lease to Woodmen in return for $1,500,000. Schoenfelder defaulted in payment of the mortgage note on March 31 and June 30, 1970, and, in addition, failed to pay the real estate taxes for the years 1965 through 1970.[2] Woodmen instituted foreclosure proceedings by advertisement and bid in the property at sheriff's sale on September 8, 1970, for $1,464,623.

Plaintiff Woodmen commenced an action for declaratory judgment in October 1970 for the purpose of determining the construction and validity of the lease to permit or authorize and order defendant Sears to pay and apply the lease rents to the payment of delinquent real estate taxes and made application, pendente lite, for an order appointing a receiver for such purpose. The petition for receivership was granted by order of the district court on February 27, 1971. The statutory period of redemption expired on September 8, 1971, without redemption by Schoenfelder. Schoenfelder appeals from that order and from a subsequent order, dated April 13, 1971, denying his motion for amended findings of fact, conclusions of law, and order for judgment amending the order of February 27, 1971.

The petition for receivership was granted on the grounds that the income-producing Sears lease constituted "a principal part and by far the most important aspect of the security," the mortgaged property alone being of a value not adequate to secure the debt; that the failure of the mortgagor-lessor to pay the real estate taxes would, by the terms of the lease, permit the lessee to terminate it and thus impair that security; and that, in these circumstances, the lessor's diversion of the rent receipts to purposes other than payment of the real estate taxes constituted "waste of the leasehold and the security for the mortgage."

---

[2] For a history of tax litigation concerning this property, see Crossroads Center, Inc. v. Commissioner of Taxation, 286 Minn. 440, 176 N. W. 2d 530 (1970).

It is the settled law of this state, under its lien theory of mortgages, that a mortgagor during the period of redemption from foreclosure retains his right of ownership, including the right to possession and the right to rents and profits, so that the mortgagee or the purchaser at the foreclosure sale may be granted the extraordinary remedy of a receivership sequestering rents and profits only to prevent waste or otherwise to protect and preserve the mortgage security. Marshall & Ilsley Bank v. Cady, 76 Minn. 112, 78 N. W. 978 (1899).

1. The real thrust of Woodmen's claim is that the assignment of the lessor's interest in the Sears lease is "a separate and distinct feature of the financing that provides separate and distinct remedies to the assignee thereof," independent of the usual equitable grounds required for the granting of a receivership. We hold that the lease was an integral part of the financing arrangement, and, as a matter of law, not so separate and distinct as to authorize a receivership without compliance with the usual conditions for a receivership.[3] Woodmen's rights under these security instruments, we further hold, terminated upon the foreclosure sale for the full amount of the debt.

The assignment of the rents under the lease to the mortgagee, as in Gardner v. W. M. Prindle & Co. 185 Minn. 147, 240 N. W. 351 (1932), did not survive the foreclosure sale. The mortgage instrument in Gardner contained an assignment of rent to pay taxes and insurance premiums, together with a provision that the mortgagee could enforce the assignment after foreclosure in the event the mortgagee itself purchased the property at the foreclosure sale. We held the mortgagee had no right to collect rents from the property for the purpose of paying or reimbursing itself for paying delinquent taxes which were liens upon the property at the time it purchased at the mortgage sale, stating that (185 Minn. 151, 240 N. W. 353) "whatever right the mort-

---

[3] Minn. St. 582.05 and 582.06 have no relevance to the issue, for we think it clear, without discussion, that there was no mortgage on a leasehold estate.

gagee has under the mortgage to collect rents, it is terminated by the foreclosure sale."

Unlike the separate but contemporaneous instruments of assignment in the instant case, the assignment of rents in Gardner was made in the mortgage instrument itself. This is only a distinction in form, for in substance both instruments here were supported by a single consideration and were integral parts of a single financing arrangement.[4]

2. We hold, too, that in these circumstances there were no equitable grounds for the granting of a receivership. This is so because Woodmen, as the purchaser at the foreclosure sale,[5] took subject to unpaid real estate taxes and is conclusively presumed to have adjusted its bid accordingly. See, e. g., Marshall & Ilsley Bank v. Cady, 76 Minn. 112, 78 N. W. 978 (1899); Peterson v. Herington, 169. Minn. 65, 210 N. W. 617 (1926) ; Gardner v.

---

[4] Farmers Trust Co. v. Prudden, 84 Minn. 126, 86 N. W. 887 (1901), involved an assignment of rents by separate agreement but subsequent to the mortgage and for a separate consideration (extension of time for payment). Although we there sustained the appointment of a receiver after the foreclosure sale, it was on the plainly distinguishable ground (84 Minn. 129, 86 N. W. 888), "that the assignment of the rents was regarded as a matter independent, and without reference to any of the mortgage provisions."

[5] The appointment of a receiver to sequester rents is usually conditioned upon a three-fold showing that the security is inadequate in relation to the debt, that there is a need to prevent waste of such character as to endanger the adequacy of the security, and that the mortgagor is insolvent. But for the foreclosure sale, the mortgagor's failure to pay taxes could well have been considered so substantial a threat to the adequacy of the security as to constitute a "species of waste." Mutual Benefit Life Ins. Co. v. Canby Investment Co. 190 Minn. 144, 147, 251 N. W. 129, 131 (1933). Irrespective of the mortgagor's solvency, moreover, his active commitment or willing permission of waste, with demonstrated intent to milk the property by nonpayment of taxes, rendering the marginal security substantially inadequate, should not alone preclude protection of the mortgagee's security interest. See, Osborne, Mortgages (2 ed.) §§ 134, 148, 149; cf., Minnesota Building & Loan Assn. v. Murphy, 176 Minn. 71, 222 N. W. 516 (1928).

W. M. Prindle & Co. 185 Minn. 147, 240 N. W. 351 (1932); Fredin v. Cascade Realty Co. 205 Minn. 256, 285 N. W. 615 (1939); Pulsifer v. Paxton, 212 Minn. 68, 2 N. W. 2d 427 (1942). See, also, Minn. St. 582.03. A contrary holding would permit a mortgagee-purchaser to obtain the property for less than it had bid in at the foreclosure sale. Holt State Bank v. Hamernes, 171 Minn. 350, 351, 214 N. W. 52 (1927); Fredin v. Cascade Realty Co. 205 Minn. 256, 260, 285 N. W. 615, 618 (1939).

3. There still remain, however, undetermined issues with respect to Schoenfelder's obligation to pay real estate taxes pursuant to the terms of the Sears lease during the statutory period of redemption, issues not adjudicated by the pendente lite order of receivership. Although the foreclosure sale terminated the assignment of rents due under the Sears lease to Woodmen as security, it did not terminate the lease itself. Schoenfelder, as lessor, remained under a lease-provided obligation to pay real estate taxes during this period, an obligation undertaken for the protection of both the mortgagee and the lessee. By the terms of the lease Sears had the right to withhold rents to pay these real estate taxes, but presumably paid them to Woodmen only because of the direction of the court's receivership order. We do not on this appeal determine either what rights, by set-off or otherwise, Sears may have against Schoenfelder or Woodmen against Sears, or what disposition should be made of the sequestered funds. We remand to the district court for its order with respect to disposition of the funds in the hands of the receiver and for other proceedings in the main action not inconsistent with this opinion. Costs are disallowed to all parties on this appeal.

Reversed and remanded.

MR. JUSTICE MACLAUGHLIN, not having been a member of this court at the time of the argument and submission, took no part in the consideration or decision of this case.