CROSSROADS CENTER (ROCHESTER), INC., AND ANOTHER v. COMMISSIONER OF TAXATION.

176 N. W. (2d) 530.

April 3, 1970—No. 41780.

*Erwin M. Goldstein* and *David Stanley,* for relators.

*Douglas M. Head,* Attorney General, *C. H. Luther,* Deputy Attorney General, and *Don J. Bottorff,* Special Assistant Attorney General, for respondent.

Heard before Knutson, C. J., and Nelson, Murphy, Otis, and Theodore B. Knudson, JJ.

THEODORE B. KNUDSON, JUSTICE.*

Certiorari to review a decision of the Tax Court which affirmed the commissioner of taxation's determination of the full and true values and assessed values of certain real property in Rochester, Minnesota, on May 1, 1965.

Two adjacent tracts of land are involved in this appeal. The first is the Crossroads Center tract of approximately 11 acres, which is owned by Crossroads Center (Rochester), Inc. On this tract there is an open-mall shopping center containing about 120,000 square feet and occupied by 23 tenants. The second tract consists of 6 1/2 acres, now owned by Lutheran Brotherhood,

---

* Acting as Justice of the Supreme Court by appointment pursuant to Minn. Const. art. 6, § 2, and Minn. St. 2.724, subd. 2.

containing a Sears department store and automotive service center.

In 1962 Crossroads Center purchased these two adjacent tracts for $343,800, about $20,000 per acre. The Sears tract cost $123,800 and the Crossroads tract, $220,000. Construction of buildings on the two tracts was completed in 1963 at a cost of $1,064,058 for Crossroads Center and $667,071 for Sears.

In December 1961 Crossroads Center entered into a lease with Sears to provide Sears with a retail store building and an automotive service center on the 6 1/2-acre tract, with a warehouse building on another parcel not involved in this case. The lease is for 25 years, with a rent equal to 2 1/2 percent of Sears' gross sales, less items returned, which the parties call "net." Under the terms of the lease the landlord is to pay real estate taxes, insurance, and some maintenance expenses.

In November 1961 Lutheran Brotherhood agreed to purchase the land and the buildings to be covered by the Sears lease for $1,300,000. The warehouse and the land on which it was situated were valued by the city at $172,051. As a result the commissioner determined that the price of the Sears tract involved here was $1,127,949. Under the sales agreement, Crossroads was to reimburse Lutheran if its expenses for taxes, insurance, and maintenance exceeded $21,500 during each of the first 5 years. When Lutheran Brotherhood purchased the land, it was pursuant to this agreement and subject to the Sears lease.

The commissioner made the following determinations as to the tracts' values:

SEARS:

*Market Value*

| | | |
|---|---|---|
| Land | $ 327,583 | |
| Structures | 667,071 | |
| TOTAL | | $ 994,654 |

*Full and True Value*

| | |
|---|---|
| Land | $ 115,265 |

| Structures | 220,120 | |
|---|---|---|
| TOTAL | | $ 335,385 |
| Total Assessed Value | | 134,154 |

CROSSROADS:

*Market Value*

| Land | $ 608,684 | |
|---|---|---|
| Structures | 1,064,058 | |
| TOTAL | | $1,672,742 |

*Full and True Value*

| Land | $ 202,680 | |
|---|---|---|
| Structures | 351,140 | |
| TOTAL | | $ 553,820 |
| Total Assessed Value | | 221,528 |

In their applications for reductions of their assessed valuations, Crossroads had said the full and true value of its structures and improvements did not exceed $351,139, and Lutheran had said the full and true value of its structures did not exceed $220,120. These figures were the same as the valuations found by the commissioner. However, both Crossroads and Lutheran contended that the full and true value of their land was significantly less than that found by the commissioner.

The commissioner's determinations were essentially those of the county assessor. The commissioner ordered a $3,054 reduction in the total assessed value of the Sears tract and a $4,584 reduction in the total assessed value of the Crossroads tract. The commissioner's order was affirmed by the Tax Court.

■ Land is assessed on the basis of market value, and Minn. St. 273.12 requires the assessor "to consider and give due weight to every * * * factor affecting the market value * * *." Relators argue that the assessor did not give due weight to the income factor and that therefore the Tax Court's findings based on the assessor's determinations cannot be sustained.

In In re Delinquent Real Estate Taxes, Waseca County, 182 Minn. 543, 544, 235 N. W. 22, we said the factors which bear on sale value are:

"* * * Location, cost of construction, cost of reproduction, purpose for which building was used, the intrinsic value or worth of the building, the price at which the owner is willing to sell, the price at which buyers who may use the property for some purpose are willing to buy, the price at which similar property, if any, has sold, and many other things * * *."

See, also, Alstores Realty, Inc. v. State, 286 Minn. 343, 176 N. W. (2d) 112. In Kalscheuer v. State, 214 Minn. 441, 447, 8 N. W. (2d) 624, 627, this court said that income is one factor to be considered in arriving at sale value. For other decisions holding income an important consideration in determining sale value, see Annotation, 96 A. L. R. (2d) 666.

■ The Tax Court cannot base its findings exclusively on the assessor's testimony if the assessor did not consider all factors. However, the assessor's valuation is prima facie valid, and even though it appears that the assessor did not follow the statutory mandates in arriving at the estimates of value, the Tax Court's findings on the issue of value must be sustained if there is other evidence to support them. Schleiff v. County of Freeborn, 231 Minn. 389, 43 N. W. (2d) 265; Alstores Realty, Inc. v. State, *supra*; In re Taxes for 1968 of Nelson v. County of Meeker, 285 Minn. 527, 172 N. W. (2d) 753. We also held, in Kalscheuer, that the burden of proof is on the person challenging the valuation.

In the present case the county assessor, Mr. Austin Dunagan, based his valuation on cost, prior sales of the same property, and sales of comparable property. He testified that he used income value as a check on these values, but that he did not use income value directly to arrive at the properties' market value. The assessor testified that he could not get enough honest income information and that he did not know the income of these properties.

*The Crossroads Property*

Mr. Dunagan, the county assessor, testified that the total value of the Crossroads Center was $1,675,500. This figure was the

total of the value of the buildings—$1,066,816—and the land value—$608,684. In valuing the land, the cost—$220,000—was considered. However, the primary basis was a comparison to the Miracle Mile shopping center in Rochester, which was determined to have a value of $1.25 per square foot. The $608,684 represents $1.25 per square foot. We find that this determination is justified by the evidence. Miracle Mile was the only other shopping center in Rochester at the time of the valuation. Four other centers have been built since that time. In addition to the use of comparables, Mr. Dunagan also considered purchases of land in the center. First, a Mr. Gus Chafoulias bought 20,000 square feet for $65,000 to construct a liquor store. As part of the consideration Crossroads agreed that Chafoulias' store would be the only retail liquor store in the center. Second, Home Federal Savings and Loan Association paid $70,000 for an acre and a quarter of land, with the agreement that it would be the only savings and loan association in the center. Crossroads also agreed to improve land for Home Federal's parking as a condition of the sale.

Mr. Howard Shenehon testified for relators and valued the property on an income basis. He said that the net annual income was $192,000. He applied a 7-percent capitalization rate, and depreciated the buildings at 2 1/2 percent over 40 years. This resulted in a 9 1/2-percent overall capitalization. He took into account taxes at 3.66 percent. These calculations produced a value of $1,520,000.

On the other hand, Mr. Donald M. Newhall testified he had valued the property for Thorpe Brothers, Inc., and had succeeded in arranging a $1,400,000 mortgage on the Crossroads Center with Metropolitan Life Insurance Company. In June 1962 Newhall valued the property on the basis of estimated net income of $162,000 after taxes. Some of the leases had been negotiated at that time and others were still being negotiated. Newhall applied a 5 3/4-percent capitalization rate to the land and used an overall capitalization rate of 7 1/2 percent. Newhall's calcula-

tions resulted in a $2,165,000 value. Newhall said that today he would use an 8 1/2-percent overall capitalization rate, but that in 1965 he would have used a 7 3/4-percent rate. Newhall said that he would probably have loaned the same amount of money in 1965 as in 1962.

On the basis of this evidence the Tax Court's findings must be sustained. In addition to the county assessor's testimony, Newhall's testimony and the sale of the Sears tract for $1,300,000 support the court's affirmance of the commissioner's valuation. The assessor does not appear to have given as much consideration to the income value as he should have, but he did say that he used income value as a check. Even had he not done so, our holding in Alstores Realty, Inc. v. State, *supra,* would sustain the conclusion reached here.

Mr. Shenehon's value based on income is only $150,000 less than the court's finding. This difference is understandable. Income value is very speculative and inexact. A small difference in either the income or the capitalization rate produces a big difference in value. Here, where the differences in income and capitalization rates were relatively large, the difference between relators' value of $1,520,000 and Newhall's value of $2,165,000 is all the more dramatic.

*The Sears Tract*

Sears has a 25-year lease at a rental of 2 1/2 percent of net sales. Mr. Shenehon used a sales figure of $4,000,000. He applied the same overall 9 1/2-percent capitalization rate and took real estate taxes into account. He came up with a value of $765,000. Mr. Dunagan, the county assessor, valued the property at $1,016,319. This represented a land value of $349,248 and a building value of $667,071.

The Sears store has not earned as much as expected, and as a consequence relators claim that the lease is very disadvantageous. They argue that since the property is burdened with an unprofitable lease the property value is considerably lower than it would otherwise be. However, the majority of cases pro-

vide that an unprofitable lease should not be used to determine value for property tax purposes. Rather, the fair rental value should be used.

In People v. Tax Comm. 17 App. Div. (2d) 225, 229, 233 N. Y. S. (2d) 501, 506, the court said:

"An outstanding lease may be a benefit or a detriment to the subject property, and thus its duration, covenants and the rental fixed are simply elements along with many other considerations used to arrive at the value of the property. The amount of rental fixed by a lease, even though negotiated at arm's length, could be very misleading, as to the true value of property, for it is well known that many rental contracts may be at excessive or inadequate rentals because of poor business judgment on the part of one party or another. * * *

"Of course, an outstanding bona fide lease and the rental income established thereby are matters to be considered in determining the 'full value' of the whole property, land and improvements. Value arrived at by capitalization of the fair rental value is, in ordinary cases, the surest guide to a sound appraisal. * * * But when there is evidence that factors such as long-term leases made under distress or boom conditions affect the actual rent, the weight to be given to the actual rent must be discounted accordingly. * * *

"So, the existence of an outstanding lease at an unrealistically low rental * * * of the property, is not to be used as a basis for calculating actual value."

Other cases holding that a fair rental is controlling over existing rental are Ernst v. Board of Assessors, 58 Misc. (2d) 504, 295 N. Y. S. (2d) 712; Donovan v. City of Haverhill, 247 Mass. 69, 141 N. E. 564; McCrory Stores Corp. v. City of Asbury Park, 89 N. J. Super. 234, 214 A. (2d) 526; In re Pine Raleigh Corp. 258 N. C. 398, 128 S. E. (2d) 855.

Thus, the income value is less important in the Sears tract than in the Crossroads tract. In Crossroads, the income appears to

be the actual value, while in Sears the rent is below actual value. It appears that relators offered no evidence of the fair rental value of the Sears buildings. The lease value here is not controlling.

The assessor's valuation, Crossroads' sale to Lutheran of the Sears tract for $1,128,000 ($1,300,000 less the warehouse valued at $172,000), and the comparison to Miracle Mile support the Tax Court's valuation of the Sears tract. Therefore, it is sustained.

3. Minn. St. 273.11 provides that the value of the land, the value of structures, and the aggregate value shall be determined. Value was arrived at in that manner. In their application to the commissioner for reduction in the assessed valuation, relators contended that the values of the structures were in the amounts ultimately determined by the commissioner. The president of Crossroads, which also managed the Sears property for the owner, Lutheran Brotherhood, likewise indicated before the Tax Court that there was "no argument with building costs with the exception" of "where you put the improvement cost of the land." It thus appears that the Tax Court recognized its obligation under the law despite its statement that the only question on appeal is that of land value and notwithstanding the fact that the appeal to the latter court was de novo pursuant to § 271.06.

Affirmed.