The **EQUITABLE LIFE ASSURANCE SOCIETY OF THE UNITED STATES, Respondent,**

v.

**COUNTY OF RAMSEY, Relator.**

No. C3–94–52.

Supreme Court of Minnesota.

April 28, 1995.

---

Attys., St. Paul, MN (Ralph W. Peterson, St. Paul, of counsel), for relator.

Kenneth A. Larson, Thomas V. Seifert, Head, Seifert, Vander Weide, Minneapolis, for respondent.

Kim Mastro, Assoc. of MN Counties, St. Paul, William Jeronimus, MN County Attys. Assoc., St. Paul, for amicus curiae.

## OPINION

ANDERSON, Justice.

This case comes to us on certiorari to the Minnesota Tax Court. Equitable Life Assurance Society of the United States challenged the Ramsey County assessor's 1990 and 1991 estimated market values of two contiguous parcels of real property that are part of the Rosedale Shopping Center, a super-regional shopping center. Relying on a discounted cash flow ("DCF") analysis, a form of the income capitalization approach to determining the market value of real estate, the tax court reduced the subject property's assessed values from $64,054,900 to $33,300,000 for 1990 and from $65,595,600 to $47,300,000 for 1991. The County of Ramsey appeals from the court's order denying its motion for amended findings of fact and conclusions of law or, in the alternative, a new trial. The county contends the court erred as a matter of law in relying solely on a DCF analysis to determine the market value of the subject property. The county further contends that if the tax court may, as a matter of law, determine the subject property's market value based solely on a DCF analysis, the DCF analysis prepared by the court was flawed. We affirm.

The real property in question consists of two contiguous parcels that are part of a 72–acre improved site operated as the Rosedale Shopping Center in the City of Roseville, County of Ramsey, Minnesota. The two contiguous parcels include a 19.2–acre parcel ("Parcel A") and a 2.17–acre parcel ("Parcel B") (the "subject property"). Equitable

Tom Foley, Ramsey County Attorney, M. Jean Stepan, Heidi M. Westby, Asst. County

owns Parcel A and holds a ground lease on Parcel B.[1]

The subject property primarily consists of Rosedale's common mall area, which includes both general common areas and 322,116 square feet of mall tenant retail space. The mall tenant retail space, also known as gross leasable area, is leased by Equitable to retail tenants. Rosedale also includes four anchor department stores connected by the common mall area. On the assessment dates in question, the anchor department stores were Dayton's, Carson Pirie Scott, J.C. Penney, and Montgomery Ward. The subject property does not include any of the four anchor department stores, which are situated on land that was not owned by Equitable on either of the assessment dates in question.

A Restatement of Operating Agreement ("Operating Agreement") governs the operations and maintenance of Rosedale's general common areas.[2] In addition to maintenance provisions, the Operating Agreement and its amendments contain a series of covenants, cross-easements, conditions and restrictions that make it possible for Rosedale to function as a unified entity. For example, each of the four anchor department stores agreed to operate stores at the current location under specified names until July 31, 1999. These provisions are known as operating covenants.

In 1985, a developer publicly announced plans to develop a multi-million square foot shopping and entertainment complex in Minnesota, today known as the Mall of America. The site proposed for the Mall of America was in the City of Bloomington, County of Hennepin, Minnesota, within five miles of Southdale Shopping Center, another super-regional shopping center that was then and is now owned by Equitable. Like Rosedale, Southdale retained Dayton's as an anchor department store. In August 1987, Dayton–Hudson Corporation,[3] the owner of Dayton's department store, informed Equitable that it intended Dayton's to be one of the four anchor department stores in the Mall of America.

Fearing that the presence of Dayton's in the Mall of America would detrimentally affect retail sales at Rosedale and Southdale, Equitable devised a strategy to keep Dayton's out of the Mall of America. On March 2, 1988, Dayton's and Equitable entered into an informal letter-agreement whereby Equitable promised to pay Dayton's a $28,750,000 nonshareholder capital contribution to construct "a new three level Dayton department store to be located adjacent to the existing Dayton department store * * * [at] Rosedale Shopping Center."[4] Equitable agreed to renovate Rosedale's general common areas and also agreed to spend up to $3 million securing consent for the renovation from the other three anchor department stores. If Equitable obtained the consents and any balance of the $3 million remained unspent, Equitable promised to pay that balance to Dayton's as an additional contribution to capital. Equitable also agreed to build two parking decks at Rosedale, one partly located on the subject property adjoining the new

1. Parcel A, which constitutes Rosedale's common mall area, has a parcel identification number of 09–29–23–42–0001. Parcel B is owned by Jo-Line Realty Corporation, which leases the parcel to Equitable for use as a parking lot. Parcel B's identification number is 09–29–23–41–0002. Under the terms of the ground lease, Equitable must pay all property taxes imposed on Parcel B, and the tax court determined that Equitable's interest in Parcel B is sufficient to maintain the petition.

2. Under the terms of the Operating Agreement, Equitable must maintain all common areas in the center. This includes the entire exterior (e.g., snowplowing, painting, seal coating of all parking areas) and the entire interior general common areas. Although the anchor department stores are required to reimburse Equitable for some portion of the cost it incurs in maintaining the interior and exterior general common areas ("common area maintenance" charges), the anchor stores do not pay rent to Equitable, and they do not pay any portion of the property tax bill levied on the subject property.

3. Although Dayton–Hudson Corporation owns Dayton's department store, throughout this opinion, both entities are collectively referred to as "Dayton's."

4. Equitable also agreed to pay Dayton's $32,300,000 to build a new store at Southdale. Both payments were subject to similar terms, covenants, conditions, and restrictions, and both payments were made to enable Dayton's to build its new stores, not to stock merchandise.

Dayton's store, and the other located off the subject property.

In consideration for Equitable's promises, Dayton's agreed to operate a "full line department store" at Rosedale, improving the quality of its operating covenant and effectively precluding Dayton's from replacing its Rosedale Dayton's store with one of its value retail divisions, such as Target. Dayton's also agreed to extend its operating covenant at Rosedale for 15 years, measured from the day Dayton's opened its new Rosedale store. Most significantly, Dayton's promised not to construct or otherwise operate a department store under the name "Dayton's" within a five (5) mile radius of Southdale Shopping Center for the life of its extended operating covenant. This "radius clause" provision effectively kept Dayton's out of the Mall of America. If Dayton's violated the radius clause, the agreement provided that Dayton's would return the capital contribution received relating to *both* the Rosedale and the Southdale expansion projects.

Dayton's further agreed to convey its old Rosedale store to Equitable for $2 million upon completion of its new Rosedale store. Equitable agreed to convert the top two floors of the old Dayton's store into additional tenant retail space. The agreement contemplated that the basement of the old Dayton's store would be integrated with the new Dayton's store, and Equitable promised both to remodel the basement at its own expense and to lease back the basement area to Dayton's for $1.00 a year. By amendment, Equitable and Dayton's incorporated the letter-agreement's provisions into the Operating Agreement on September 20, 1990.

Equitable split its expansion and renovation of Rosedale into two phases. Phase I entailed upgrading and renovating the existing mall's interior general common areas. During Phase I, Dayton's built its new store while its old store remained open. Phase II entailed converting the upper two levels of the old Dayton's store to approximately 74,000 square feet of additional tenant retail space.

Phase I began in July 1990. It entailed adding new handrails, three new 40 by 50-foot skylights, a new marble and limestone floor, five new rooftop heating, ventilating, and air-conditioning units ("HVAC"), and a new rooftop emergency generator. It also entailed removing asbestos from the subject property's general common areas.

In August 1991, Phase I was complete, and Dayton's opened its new store. Dayton's then conveyed its old store to Equitable, and Phase II of the project began—renovating the old Dayton's store into new mall tenant spaces and general common area. The Phase II expansion space opened in August 1992, which incidentally was the same month the Mall of America opened.

■ Income-producing real estate, such as a super-regional shopping center like Rosedale, is typically purchased as an investment, and from an investor's point of view, earning power is a critical element affecting property value. The Appraisal Institute, *The Appraisal of Real Estate* 409 (10th ed. 1992). A property's earning power includes its expected annual cash flow, cumulatively accruing over the term of ownership, or "holding period," plus the proceeds from the resale, or "reversion," of the property upon terminating ownership. *Id.* at 413.

■■ Appraisers use a DCF analysis to estimate the value of income-producing property that does not have a stabilized stream of income. *Id.* at 531–32. Generally, a DCF analysis is based on the principle of anticipation, forecasting the annual cash flows expected over the holding period, and discounting those cash flows at a required rate of return to derive an indication of present value.[5]

---

5. The return on an investment compensates the investor for foregoing present benefits (i.e., the immediate use of capital) and accepting future benefits and risks. The Appraisal Institute, *The Appraisal of Real Estate* 483 (10th ed. 1992). This return is usually called "interest" by lenders and "yield" by equity investors. *Id.* To select the appropriate yield rate for a market value appraisal, the appraiser analyzes market evidence of the yields anticipated by typical investors. *Id.*

"Present value" means the current value of a future payment, or series of payments, discounted at some compound or discount rate. Black's Law Dictionary, 1184 (6th ed. 1990).

In preparing a DCF analysis, an appraiser uses sophisticated computer software to create detailed spreadsheets that show the property's cash flows for every year during the presumed holding period. The appraiser uses these spreadsheets to account for both the amount and the timing of all cash flows into and out of the property being appraised. The appraiser then accounts for the time-value of money by discounting the property's annual net cash flows to derive an indication of present value. The appraiser adds together the present value amounts of all the annual cash flows to derive a figure that represents the cumulative present value of all annual cash flows accruing to the property over the holding period. *Id.*

A sale of the property is presumed to occur at the end of the holding period, and the expected selling price of the property is called the "reversion." [6] The appraiser discounts the amount of the property's reversion to derive its present value, and then adds this· figure to the cumulative present value of the property's net annual cash flows to derive the total present value of the property being appraised. *Id.* at 531–41.

For his appraisal, Equitable's expert appraiser, Alan Leirness, considered the three traditional appraisal approaches used to determine the market value of real estate; the market comparison approach, the cost approach, and the income capitalization approach. But, ultimately, Leirness decided to base his appraisal solely on a discounted cash flow ("DCF") analysis, a form of the income capitalization approach. At trial, Leirness gave an opinion of value for the subject property of $27,400,000 on January 2, 1990 and $41,700,000 on January 2, 1991.

At trial, the county's expert appraiser, Peter Patchin, testified to four different opinions of value for the subject property on the assessment dates in question. These four different value opinions resulted from Patchin's failure to incorporate certain expenses in his original appraisal and from Patchin's correction of a computational error contained in his DCF analysis. Reconciling these various

opinions of value, the tax court concluded that Patchin's opinion of value for the subject property was approximately $70,000,000 for both assessment dates in question. The court explained that the large disparity between the value opinions of the two appraisers resulted from the dissimilar expense data entered in the DCF analyses that each prepared.

The tax court found that a typical prospective purchaser of a super-regional shopping center would prepare its own DCF analysis and would ignore both the market comparison approach and the cost approach, the other two traditional valuation approaches. Thus, the court concluded that a DCF analysis was appropriate for determining the value of the subject property, and gave no weight to either the market comparison approach or the cost approach.

The tax court did not fully adopt the variables and analysis of either expert appraiser. Instead, using variables it found to be reasonably supported by the evidence, the court prepared its own DCF analysis to determine the value of the subject property. In its DCF analysis, the court first calculated the subject property's "adjusted operating income" for 1990 and 1991 by deducting ordinary operating expenses from actual gross income. Based on the subject property's actual adjusted operating income for 1990 and 1991, the court estimated the subject property's adjusted operating income for each year remaining in the presumed holding period. The next step in the court's DCF analysis entailed deducting both expenses for reserves and capital expenditures from each year's estimated adjusted operating income to determine the subject property's annual cash flow.

Forecasting expenses for reserves in its DCF analysis, the tax court reserved an amount for future renovation of the subject property's general common areas. Next, the court determined that the reserve amounts forecasted by Equitable for asbestos removal, HVAC replacement, roof replacement, and parking lot repair were reasonably sup-

---

**6.** The appraiser forecasts the amount of the reversion by applying a "terminal capitalization rate" ("TOAR") to the cash flow forecasted. for the first year that follows the end of the holding period. The appraiser derives the appropriate TOAR from analyzing market data.

ported by the estimates contained in engineering consultant reports admitted into evidence. The court admitted these reports over the county's objection. The county objected to the admission of these reports on the grounds that Equitable failed to provide them to the county at least 45 days prior to the trial as required by Minn.Stat. § 278.05, subd. 6(a) (1992) and Minn.Stat. § 271.06, subd. 7(b) (1992).

The tax court divided capital expenditures incurred or anticipated into three categories: (1) "on-site" expenses related to the renovation of the subject property's general common areas; (2) "off-site" expenses, including the $28,750,000 nonshareholder capital contribution to Dayton's, the expenses related to building parking decks, and the expenses related to obtaining a renewal of the operating covenant from each of the anchor department stores, forecasted to occur in 1999; and (3) the expenses of acquiring and renovating the old Dayton's store.

Capital expenditures deducted from the subject property's annual adjusted operating income amounted to $15,300,000 for 1990 and $26,600,000 for 1991. Equitable actually expended these amounts in these years. The tax court deducted on-site expenses of renovating the subject property's general common areas in the year these expenses were actually incurred. The court also deducted

off-site expenses in the year expended. In deciding to take off-site expenses into account, the court determined that expensing off-site expenses in its DCF analysis was consistent with the opinions expressed by both expert appraisers. Quoting *Uniform Standards of Professional Appraisal Practice* (1992), the court expressed the opinion that the expenses "were appropriately deducted in the year expended because a DCF Analysis is 'a study of the anticipated movement of cash into or out of an investment.' " [7]

The tax court did not deduct the expenses of acquiring and renovating the old Dayton's store from the subject property's adjusted operating income.[8] The court considered the expenses related to the old Dayton's store to be expenses of newly acquired property (i.e., a separate parcel), not expenses of the subject property.

As the final step in its DCF analysis, the tax court discounted the future cash flows, including the forecasted reversion, using a yield rate derived by adding the effective property tax rate from the first year of the holding period to the discount rate and the terminal capitalization rate. *See Bowler Partnership v. County of Hennepin,* 1991 WL 68490 at *5 (Minn.Tax Court 1991) (stating "[o]ur usual method is to [exclude] from expenses amounts paid for real estate taxes,

7. By allowing expenses that are projected, but not actually incurred, to reduce the present value of the property, a DCF analysis potentially allows an owner to perpetuate a reduction in the property's value year after year until the owner actually makes the expenditure. The county contends that a potential purchaser in 1990 or 1991 would have postponed making expensive repairs, such as roof or parking lot repairs, until such repairs became absolutely necessary. Because Equitable had not actually repaired such items as late as 1993, the county contends that an artificial suppression of value results if such repair expenses are included in the early years of a DCF analysis. The county correctly asserts that expenses forecasted in the early years of the holding period affect the property's market value more dramatically than expenses forecasted in the holding period's later years. This more dramatic effect results from the discounting process.

We agree with the county that, if the property is not actually sold, the owner should not be able to receive the perennial benefit of anticipating the expenditures. These observations lead us to advise that an appraiser should forecast expenses

to correspond to the year in which they are likely in fact to occur. The tax court then must cautiously exercise its discretion to determine the timing of expense forecasts.

The tax court was persuaded that a prospective purchaser on the assessment dates in question would have conducted engineering studies similar to the engineering studies that were conducted in 1992. The court concluded that similar studies conducted in 1990 or 1991 would have come to the same conclusions as the studies done in 1992. Based on the recommendations contained in the engineering reports that were admitted into evidence, we cannot say the tax court in this case abused its discretion in timing its expense forecast.

8. Leirness, Equitable's expert appraiser, anticipated that the new tenant retail space created by renovating the conveyance property would generate additional rental income and tenant contributions for common area maintenance. In its DCF analysis, the court excluded these anticipated income and contribution amounts from the subject property's projected income.

which are after all in issue, and instead add the tax rate to the capitalization rate"). This is called a "loaded" yield rate. Patchin, the county's expert appraiser, used this same loaded-yield rate approach.

In an order dated September 24, 1993, the tax court found the market value of the subject property to be $33,300,000 on January 2, 1990 and $47,300,000 on January 2, 1991. The county moved for amended findings of fact and conclusions of law or, in the alternative, a new trial. The court denied the county's motions, and on November 2, 1993, judgment was entered.

## I.

■ This court recognizes the three basic approaches to determining the market value of real estate: (1) the market comparison approach, which is based on prices paid in actual market transactions involving comparable properties; (2) the cost approach, which is founded on the proposition that an informed buyer would pay no more for the property than the cost of constructing new property having the same utility as the subject property; and (3) the income approach, which is predicated on the capitalization of the income the property is expected to generate. *Lewis & Harris v. County of Hennepin,* 516 N.W.2d 177, 178 (Minn.1994); *Montgomery Ward v. County of Hennepin,* 450 N.W.2d 299, 302 (Minn.1990); *Federal Reserve Bank of Minneapolis v. County of Hennepin,* 372 N.W.2d 699, 700 (Minn.1985).

The county claims the tax court erred as a matter of law in relying solely on a DCF analysis to determine the market value of the subject property. That claim presents a legal issue, which we review *de novo.* The county further claims that if the tax court may, as a matter of law, determine the subject property's market value based solely on a DCF analysis, the DCF analysis prepared by the tax court was flawed.

■ This court will not disturb the tax court's valuation of property for tax purposes unless the tax court's decision is clearly erroneous, which means the decision is not reasonably supported by the evidence as a whole. *Westling v. County of Mille Lacs,*

512 N.W.2d 863, 866 (Minn.1994) (citation omitted). The tax court's decision should be considered clearly erroneous only when this court is left with a " 'definite and firm conviction that a mistake has been committed' * * *." *Id.* (quoting *In Re Assessments of Silver Lake Apartments v. County of Olmsted,* 295 Minn. 548, 549–50, 204 N.W.2d 415, 416 (1973)). The taxpayer has the burden of showing that the valuation reached by the assessor is excessive. *Id.* The inexact nature of property assessment necessitates that this court defer to the decision of the tax court unless the tax court has either clearly overvalued or undervalued the subject property, or has completely failed to explain its reasoning. *Harold Chevrolet v. County of Hennepin,* 526 N.W.2d 54, 58 (Minn.1995).

### A. *Both Parties Placed Primary Reliance On A DCF Analysis*

In valuing the subject property, Equitable's expert appraiser, Alan Leirness, considered using the three traditional appraisal approaches to value, but ultimately decided to base his appraisal solely on a DCF analysis, a form of the income capitalization approach. The county's expert appraiser, Peter Patchin, used and reconciled the three traditional appraisal approaches to value in his original appraisal of the subject property. At trial, however, Patchin relied on a DCF analysis for his final revised valuation of the subject property.

Leirness testified that a likely buyer of the subject property would not prepare a cost approach valuation because the cost approach is premised on the principle of substitution, which holds that a buyer can obtain property similar to the subject property without undue delay. Leirness stated that no substitution property existed for Rosedale, and building a similar super-regional shopping center would take seven to ten years to complete due to requirements such as securing financing, preparing environmental impact statements, developing an infrastructure, securing anchor department stores, and obtaining regulatory approval. Although Patchin's original appraisal purported to give the cost approach some supporting weight in his reconciliation of values, he testified that he "wouldn't give

it primary weight, or anything close to it, for the simple reason the market just doesn't give it that much weight."

In considering the market comparison approach, Leirness testified that he conducted a "very exhaustive" search for sales of regional and super-regional shopping centers throughout the United States. Leirness testified that the market comparison approach was useful in allowing him to discern what information is important to buyers of such property, but he was not able to obtain enough detail about the sales. Thus, he could not make the appropriate adjustments to the sale prices of the other properties, and he was unable to prepare a direct market comparison approach appraisal.

■ Patchin purportedly prepared a market comparison approach from which he derived a big "ballpark" comfort range, which amounted to $225–$325 per square foot of gross leasable area. Patchin's value determination of $70 million, however, amounts to approximately $217 per square foot ($70,000,-000/322,116 gross leasable area), which is outside his own "comfort" range. Moreover, on cross-examination, Patchin admitted that he "made no attempt to relate any individual comparables with the subject [property]." Consequently, Patchin's market comparison approach was entitled to little, if any, weight.[9]

Leirness testified that he based his value determination solely on a DCF analysis. Patchin's original appraisal report purported to give weight to all three valuation approaches. Nevertheless, Patchin testified that the income approach (DCF) "has to be given primary weight, which is hardly a surprise to anybody who has ever appraised a shopping center." Moreover, it appears that Patchin virtually abandoned the other two approaches to value during his trial testimony. Patchin testified that his revised DCF analysis, which incorporated expense estimates contained in the consultant's reports that were admitted over the county's objection, indicated his "final" opinion of the subject property's value. Patchin's "final" opinion was based solely on his revised DCF analysis, and on cross-examination, he assented that Equitable's attorney could "feel free then to disregard at least the portions of the [appraisal] report that [Patchin] previously submitted, indicating that the value on January 2, 1990 was some number other than $74,700,000." Because Leirness based his value determination solely on a DCF analysis, and because it is evident that Patchin's revised opinions of value were determined by using a DCF analysis, this case ultimately comes down to an evaluation of contrasting DCF analyses.

### B. *Reliance On A DCF Analysis*

■ Whenever possible, appraisers should apply at least two approaches to market value because the alternative value indications derived can serve as useful checks on each other. *The Appraisal of Real Estate* at 79–80. In a given valuation assignment, more than one approach to value is usually appropriate and necessary. *Id.* at 77. A final determination of value, however, may require that one approach be given greater emphasis in making a final value estimate. *Id.* The appraiser's judgment and experience, and the quantity and quality of data available, may determine which approach or approaches are used and what weight each deserves. *Id.*

---

9. During their testimony regarding the market comparison approach, both expert appraisers discussed the sale of Ridgedale Shopping Center, located in Minnetonka, Minnesota, a western suburb of the Twin Cities metropolitan area. In 1989, Ridgedale sold as part of a $226 million package with the Southland Shopping Center located in Michigan. The parties to that sale allocated $124 million of the package price to the purchase of Ridgedale, an amount Patchin conceded was not necessarily sincere. Patchin stated that "everyone agrees that's a lot of money for a mall in the Twin City area," and the purchasers might have overpaid by $35 million. Moreover, others testified that Ridgedale probably was the last really large sale in the real estate industry before the market declined near the end of 1989. Thus, it appears that the Ridgedale sale price needs significant adjustments before it could constitute a comparable sale. Because neither appraiser made those required adjustments, we conclude the purported sale price of Ridgedale, as indicated by the amount allocated towards its purchase, is entitled to little, if any, weight when using the market comparison approach.

This court has stated that the three valuation approaches " 'are suggested but are neither exclusive nor mandatory upon either the assessor or the factfinding court.' " *Alstores Realty, Inc. v. State,* 286 Minn. 343, 352, 176 N.W.2d 112, 118 (1970) (quoting *Great Plains Supply Co. v. County of Goodhue,* 268 Minn. 407, 409, 129 N.W.2d 335, 336 (1964)). In considering each of the three valuation approaches, the priority and quantum of reliance depends on the facts of each case. Recently, this court has stated:

> With respect to the propriety of placing greater weight on the replacement cost approach, according the market data approach minimal weight, and of considering the income approach not at all helpful, we note that, at best, appraisal is an inexact value determination. It must be conceded, we believe, that an appraisal is an estimate of value. That is the reason for the development of three approaches to value. Viewing value from three different perspectives may help the appraiser arrive at an estimate closer to actual market value than if the property were viewed from a single perspective. Whatever weight priority may usually attach to each approach, the priority and quantum of reliance depends on the facts of each case.

*Lewis & Harris v. County of Hennepin,* 516 N.W.2d 177, 180 (Minn.1994).

Minnesota law requires every assessor to "consider and give due weight to every element and factor affecting the market value" of real property for the purpose of taxation. Minn.Stat. § 273.12 (1992). The term "due weight" implies that every element and factor deserves only so much weight as is appropriate to the valuation problem at issue. Minnesota law does not require an appraiser to give weight to all three valuation approaches in every appraisal assignment. This court's decision in *Crossroads Ctr. v. Commissioner of Taxation,* which applied a prior version of this statute, also does not mandate that an appraiser give weight to all three valuation approaches. 286 Minn. 440, 176 N.W.2d 530 (1970). Consequently, although the circumstances will rarely warrant giving weight to only one approach to value, we hold that, under appropriate circumstances, a single approach may be used to determine the market value of the property being appraised. *See In Re McCannel,* 301 N.W.2d 910 (Minn.1980) (holding it was not error to rely on a single-emphasis approach in appraising a special purpose building); *Federal Reserve Bank of Minneapolis v. State,* 313 N.W.2d 619, 624 (Minn.1981) (relying solely on cost approach not clearly erroneous in context of special purpose property).

In determining whether the circumstances warrant giving weight to only one approach to value, Minnesota law requires an appraiser to "consider" all three valuation approaches, as well as other factors relating to the subject property's market value. Both expert appraisers in this case testified that they considered all three valuation methods; but ultimately, both expert appraisers either explicitly or implicitly gave weight only to the income capitalization method (DCF analysis).[10] Because the expert appraisers of both parties in this case relied on a DCF analysis in determining the market value of the subject property, because of the uncommon circumstances facing the subject property on the assessment dates in question, and because neither judicial nor statutory law mandates the tax court give weight to all three valuation approaches, we conclude the court did not abuse its discretion in determining the market value of the subject property based solely on a DCF analysis.

We emphasize that if the tax court is persuaded that the traditional valuation approaches deserve no weight because they do not accurately reflect the value of the property, then the court must clearly explain the weaknesses of the rejected approaches. *See*

10. The county points out that Equitable's valuations asserted at trial are lower than the estimated valuations contained in Equitable's annual certificates of value, which Equitable prepares and uses internally. Although Equitable's internal valuations are a relevant factor to be considered in determining the market value of the subject property, when considered with the other evidence presented at trial, these higher internal valuations alone do not abrogate the tax court's lower valuation of the subject property.

*Westling v. County of Mille Lacs,* 512 N.W.2d 863, 866 (Minn.1994). Because the court explained the weaknesses involved in using the market and cost approaches to value, and because evidence in the record is sufficient to support the court's conclusion that those approaches would not be helpful in valuing the subject property, we hold the court was within the bounds of its discretion in relying solely on a DCF analysis in this case.

■ In sanctioning the use of a DCF analysis in this case, we do not intend to give the method universal approval. We recognize that accurate forecasting is a crucial part of any income capitalization method, and that income and expense projections that are not warranted by market evidence can result in unsupported market values. *See* Donald R. Epley, *Minimum Market Data Needed and Recommendations for an Accurate Discounted Cash Flow Analysis,* The Real Estate Appraiser and Analyst (Fall 1988). A DCF analysis can only provide accurate results if the forecasts are based on accurate, reliable information. We further recognize that the compounding effects in the projection of income and expenses can magnify even slight errors to produce unreasonable results. *The Uniform Standards of Professional Appraisal Practice,* Statement—2 (1992). Consequently, we admonish that routine reliance on a DCF analysis alone is not justified, and we reiterate that consideration of all three valuation approaches helps the appraiser and the court arrive at an estimate that is closer to actual market value than if the property were viewed from a single approach.

## II.

■ We next address the county's contention that the tax court's own DCF analysis improperly determined the investment value of the subject property as opposed to its market value. Minnesota law requires that all real property be assessed at its market value. Minn.Stat. § 273.11 (1992). "Market value" is defined as "the usual selling price at the place where the property to which the term is applied shall be at the time of assessment; being the price which could

be obtained at a private sale * * *." Minn. Stat. § 272.03, subd. 8 (1992). In contrast to market value, "investment value" is value to a specific individual, not value in the general marketplace. *The Appraisal of Real Estate* at 24.

This court has defined market value as "the price for which property would sell upon the market at private sale." *State v. Fridley Recreation & Service Co.,* 288 Minn. 218, 220, 179 N.W.2d 172, 174 (1970); *Dulton Realty, Inc. v. State,* 270 Minn. 1, 3 n. 2, 132 N.W.2d 394, 397 n. 2 (1964). The tax court followed this definition, phrasing the issue as: "What would a willing, knowledgeable purchaser pay a willing seller for the Property on the assessment dates?" Leirness and several other witnesses identified institutional investors or large development companies as the likely universe of prospective purchasers of the subject property. Consequently, Leirness prepared his DCF analysis with that likely market in mind, incorporating the investment criteria held by such entities. Because value, to a large extent, is created in the minds of individuals who constitute a market, it appears that Leirness was being realistic in determining the market conditions to include in his DCF analysis.

■ Patchin speculated that Equitable's agreement with Dayton's might not have been entered into by someone other than Equitable. Indeed, there was some indication in the record that this was a business decision unique to Equitable and its market share position in the Twin Cities on the assessment dates in question. The tax court, however, found that a "prospective purchaser would be a sophisticated investor who would project the cash flow and the capital requirements of the Property during the ownership period." Further, based on testimony presented at trial, the court concluded that "a prospective purchaser would determine return on investment expectations based upon risks inherent in the Property including a forecast of the timing and price of the future sale of the Property." Thus, we conclude, in this case, the court determined the value of the subject property from a generic, objective, typical buyer's perspective, and this per-

spective satisfies the statute's definition of market value.

## III.

Having concluded the tax court did not abuse its discretion in relying on a DCF analysis to determine the market value of the subject property, we next address the county's claim that the court erred in preparing its own DCF analysis. The county contends that the court's greatest mistake in preparing its DCF analysis was the deduction from income of off-site expenses not directly attributable to the subject property. The county further contends the court should have excluded from its DCF analysis expense estimates contained in consultant reports that were admitted into evidence over the county's objection. Concluding the court did not clearly err, we reject the county's contentions.

### A. Off–Site Expenses

The county properly asserts that the issue is not whether a purchaser would take such expenses into account, but whether these expenses are properly attributable to the subject property. See Westling v. County of Mille Lacs, 512 N.W.2d 863, 867 (Minn.1994) (Keith, C.J. concurring) (approving an approach that allows the income stream to be adjusted "to reflect the estimated annual cost of remedial work specific to the subject property * * * ") (emphasis added) (citation omitted). Nevertheless, the tax court concluded that the "costs at issue were appropriately deducted in the year expended because a DCF Analysis is 'a study of the anticipated movement of cash into or out of an investment' " (quoting Uniform Standards of Professional Appraisal Practice (1992)).

The tenth edition of The Appraisal of Real Estate supports the tax court's conclusion that capital expenditures are properly attributable to the subject property. The Appraisal of Real Estate explains:

When cash flows are estimated for a discounted cash flow analysis, capital expenditures may be deducted from the net operating income in the year the expenditure is expected to occur. This is particularly important when the property's future net operating income is based on the assumption that the capital expenditures will be made. In this case failure to account for the capital expenditure could result in an overstatement of value.

The Appraisal of Real Estate at 452. This admonishment, however, does not distinguish between on-site capital expenditures, which clearly can be deducted from the subject property's cash flows, and off-site capital expenditures, which are in question.

■ The off-site expenses in question include expenses related to obtaining an extension of the operating covenant from each of the anchor department stores and Equitable's nonshareholder capital contribution to Dayton's. Patchin disagreed that Equitable would have to pay to renew the anchors' operating covenants in 1999, but if evidence supported that those payments should be expected to occur, he agreed with Leirness that the proper way to account for those payments would be to expense them in the DCF analysis for the year they were anticipated to occur. The county conceded that, in theory, such potential anchor-covenant-renewal payments could properly be deducted from the subject property's adjusted operating income, stating:

[A]llowing a deduction for theoretical payments to the anchors for operating covenant renewal would not be inconsistent with [the County's] position that off-site expenses are not chargeable against the subject property's income. Pursuant to the operating agreements, certain property rights are exchanged between the mall and the anchors. For example, the mall has an interest in ingress and egress and parking on the anchor property. There has been an exchange of property rights that run with the land for the term of the operating covenant. So to the extent that a payment would be made to protect those rights of the mall, they could in theory properly be offset against mall property's income.

(Respondent's post-trial brief at 56, # 18) (emphasis added). The tax court concluded the anchor store payments in 1999 would be necessary, and considering the county's position as evinced by both Patchin's testimony and its post-trial brief, the court did not

clearly err in expensing those anticipated payments in its DCF analysis.

██ The two expert appraisers disagreed on whether Equitable's nonshareholder capital contribution to Dayton's should be deducted from the subject property's cash flow. Leirness opined that such expense was properly deducted from the subject property's cash flow in the year it occurred. Patchin disagreed, however, distinguishing between the potential anchor store payments in 1999 and Equitable's nonshareholder contribution to Dayton's. But neither Patchin nor the county explained how the tax court could sensibly distinguish the two payments.

The tax court refused to distinguish between the potential anchor store payments in 1999, which, as we have explained, both parties conceded were deductible, and the nonshareholder contribution to Dayton's. Both payments were made to maximize the income and value of the subject property. Both expert appraisers either explicitly or implicitly agreed it would be appropriate to allow Equitable's off-site expenditures to be deducted from its adjusted operating income as part of a DCF analysis. The court, therefore, deducted the amount of the nonshareholder capital contribution, concluding that deducting Equitable's nonshareholder capital contribution to Dayton's from the subject property's adjusted operating income was consistent with the appraisers' treatment of the operating covenant renewal payments forecasted to occur in 1999.

Because the testimony of both expert appraisers supports the tax court's decision to deduct what it characterized as "off-site" expenses from its DCF analysis, we cannot conclude that deducting these expenses was clearly erroneous. We emphasize, however, that a super-regional shopping center's functioning as a unified entity greatly affects the value of the shopping center, and most contiguous parcels of real estate do not require such confederation.

B. *Expense Estimates Contained In Challenged Consultant Reports*

The county claims the tax court's DCF analysis should have excluded the expense

estimates contained in the consultants' reports. Equitable delivered these reports to Patchin less than 27 days before trial. The county objected to their admission into evidence on the grounds that they were not timely submitted. Specifically, the county maintains the reports should have been excluded from evidence because Equitable failed to submit them within 45 days before trial as required by Minnesota law. Minn. Stat. §§ 271.06, subd. 7(b), 278.05, subd. 6(a).

Minnesota Statute § 271.06, subd. 7(b) states in pertinent part:

> information, including income and expense figures, verified net rentable areas, and anticipated income and expenses, for income-producing property which is not provided to the county assessor at least 45 days before any hearing under this chapter, is not admissible except if necessary to prevent undue hardship or when the failure to provide it was due to the unavailability of the evidence at that time.

Minnesota Statute § 278.05, subd. 6(a) contains identical language. These statutes apply to this case because the trial was held after the statutes' effective dates. 1992 Minn.Laws, ch. 511, art. 2, § 61.

██ Patchin's original opinion of the value of the subject property was $82 million on January 2, 1990 and $84 million on January 2, 1991. Patchin did not incorporate the expenditure estimates contained in the challenged reports into his original DCF analysis. Patchin testified that because he had not received the consultant reports by the time he prepared his original appraisal, he did not have time to conduct his own studies, and he had no basis upon which he could contest the reports' validity. Nevertheless, Patchin did incorporate the expense estimates contained in the reports in a revised DCF that he prepared during the trial. After accounting for the expenses contained in the reports and after correcting a computation error in his revised DCF, Patchin stated that his opinion was that the value of the subject property was "closer to" $70 million on both assessment dates in question.[11]

In its memorandum supporting its denial of the county's alternative motion for amend-

11. On cross-examination, after correcting a com-    putational error that understated expenses and

ed or additional findings or a new trial, the tax court stated: "A review of Mr. Patchin's testimony, in particular his responses to questions asked during cross-examination, indicates without a doubt that Mr. Patchin relied upon the information [the county] is attempting to exclude and that he changed his opinion of value in reliance upon it." The court also found that the county "was not 'surprised' by this information at trial." Further, the court declared that "if [Patchin] had exercised ordinary prudence, he would have known the condition and age of the roof, HVAC system and parking lot and would have known that there was asbestos on site." [12] Moreover, Patchin asserted that a misleading indication of value would result if the expenses contained in the reports were not taken into account. Indeed, Patchin's revised DCF indicates that excluding the evidence results in an overstatement of value of at least $12 million or $14 million. Under the circumstances, the court did not abuse its discretion by admitting the engineering consultant reports.

### IV.

Finally, we address whether the tax court must disclose its spreadsheets when it determines property value based on its own independent DCF analysis. The county argues that there is "no discernible basis for the court's finding of value" because the court failed to attach its DCF spreadsheets to its order.

■ Minnesota law requires the tax court to determine every appeal by written order containing findings of fact and the decision of the court. Minn.Stat. § 271.08, subd. 1 (1992). The trial in this case covered a two-week period occupying over 2,100 pages of trial transcript, in which 17 witnesses testified and 130 exhibits were admitted. The court's written order in this case contains 17 findings of fact and is accompanied by a 19-page explanatory memorandum. When, as in the present case, the order and explanato-

ry memorandum explain the court's valuation methodology, the court is not required to disclose its own DCF analysis spreadsheets. We conclude the court did not err by not attaching its DCF spreadsheets to its order.

When the tax court reconciles conflicting opinions of value and arrives at a compromise valuation, that compromise must have evidentiary support. *Northerly Centre Corp. v. County of Ramsey,* 311 Minn. 335, 342, 248 N.W.2d 923, 927 (1976) (citing *Halla v. County of Hennepin,* 306 Minn. 533, 534, 237 N.W.2d 348, 349 (1975)). In the present case, the county's claim that no discernible basis exists for the court's finding of value is without merit. Considering the volume of evidence, the court's written findings of fact, conclusions of law, and explanatory memorandum, we are persuaded that the evidence supports the court's compromise in valuation.

Affirmed.

COYNE, Justice (concurring specially).

I concur in the result reached by the majority.

---

overstated net operating income (thereby overstating value), Patchin concluded that the value on January 2, 1990 was $64,590,000 and on January 2, 1991 was $66,550,000. He returned the next day, stating that he thought the values derived from taking into account the expenses contained in the reports was closer to $70 million on both assessment dates in question. The

court adopted this figure as Patchin's market value estimate.

**12.** On cross-examination, Patchin admitted, among other things, that he should have inquired further about the presence of asbestos on the subject property.