KMART CORPORATION, Relator,

v.

COUNTY OF BECKER, Respondent.

No. A05–1069.

Supreme Court of Minnesota.

Feb. 9, 2006.

Thomas R. Wilhelmy, Laurie J. Miller, Fredrikson & Byron, P.A., Minneapolis, MN, for appellant.

Gretchen D. Thilmony, Asst. Becker County Atty., Detroit Lakes, for respondent.

## OPINION

ANDERSON, G. BARRY, Justice.

Kmart contested the assessed value of its Detroit Lakes store for taxes payable in the years 2002, 2003, and 2004. The Becker County assessor had originally estimated the market value of the store to be between $2.77 million and $2.8 million for the disputed three years. Kmart's expert appraiser opined that the value was actually $2.35 million for each year; Becker County's expert appraiser opined that the value was actually $3.3 million for each year. After a trial, the tax court found

that the store's fair market value was $2,720,380 for each of the three years. Kmart moved for amended findings based on perceived inconsistencies between the tax court's factual finding and the tax court's memorandum explaining how it arrived at the store's fair market value. The tax court heard and denied Kmart's motion, and affirmed the valuation of $2,720,380. We affirm.

Kmart leased the disputed property from the owner from the time the building was constructed in 1990 until Kmart purchased it outright in 1999. Kmart purchased the property, along with two others that it was leasing from the same owner, for a package price of $11 million. The purchase price of the disputed property was $3,696,000. In 2001, a Super Wal–Mart opened approximately one-half mile from the property, shortly after the valuation date for the property taxes payable in 2002. The Becker County assessor placed a January 2, 2001, estimated market value on the property of $2,772,800 for taxes payable in 2002. The January 2, 2002, and 2003 assessed values were $2,786,700 and $2,799,500, respectively.

Both Kmart and Becker County hired appraisers to determine the fair market value of the property for the years at issue. The appraisers filed substantial reports, with Kmart's appraiser (Leirness) valuing the property at $2.35 million for each of the three years, and the county's appraiser (Dahlen) valuing it at $3.3 million for each of the three years. Both appraisers used the comparable sales and the income methods for determining value, while Dahlen also used the cost replacement method. Because the property was 11 years old on the date of valuation, the tax court placed no weight on the cost replacement method.

■ The comparable sales method attempts to value a property by comparing the recent arm's length sales prices of similar properties and then adjusting those sales prices for differences between the sold property and the subject property. Leirness determined that 17 property sales were comparable; Dahlen determined that four property sales were comparable. Both appraisers agreed that three sales of leased fee interests in existing Kmart stores were comparable properties for valuing the property. Two of the three sales were the other two properties sold as a package with the disputed property for $11 million in 1999. The tax court "place[d] the most weight on" those three properties chosen by both appraisers.

In their appraisals, with the exception of one mathematical error admitted by Dahlen at trial, both parties essentially agreed that the sales price of the three comparable properties ranged from $36.71 to $40.88 per square foot. The appraisers then made adjustments for the differences in value of the comparable properties and the Becker County property. In making adjustments, the appraisers' primary disagreement was the amount of adjustment required to reflect the difference in value between the sale of the comparable properties, which were subject to a long-term lease at time of sale, and a sale of the property in fee simple. Dahlen testified that no adjustment was necessary because the leases on the comparable properties reflected a fair market rental cost. Leirness testified that the leases on the comparable properties reflected an above-market rent, and the value of the comparable properties, without a lease attached, would be 15% lower.

After adjustments, Dahlen's value per square foot of the comparables ranged

from $36.71 to $42.81.[1] Using the comparable sales method, Dahlen estimated that the value of the property was $39 per square foot. Leirness's value per square foot of the comparables, after adjustments, ranged from $28.68 to $29.84. Using the comparable sales method, Leirness estimated the value of the property to be $27 per square foot. The tax court found that under the comparable sales method, a value of $35 per square foot was reasonable. Multiplying the square foot value by the total square footage of the property, the tax court calculated a property value of $3,040,765 using this method.

Both appraisers also utilized the capitalized income method to value the property. The income method values a property by capitalizing the net annual income the property would be expected to generate. In the present case, the two key components of this value are the net fair market rental income the property would generate and the capitalization rate a typical investor would expect. Leirness estimated the net annual income of the property to be $250,000, while Dahlen estimated the net annual income to be $310,000. The tax court generally agreed with Leirness on the net fair market rental income the property would generate and apparently used a net annual income amount of $246,000. Dahlen used a 9.5% capitalization rate for his appraisal, while Leirness used a 10.5% rate after he also discussed the use of a 10.25% rate. The tax court used the lower of the two rates (10.25%) that Leirness discussed in his appraisal. The tax court found the prop-

erty's value using the capitalized income method to be $2.4 million.[2]

The tax court then apparently averaged the values derived from the two methods, $2.4 million using the capitalized income method and $3,040,765 using the comparable sales method, and concluded that the market value of the property for all three years was $2,720,380. Kmart moved for amended findings, alleging inconsistencies between the tax court's findings of fact and the tax court's memorandum explaining how it arrived at its finding of value. The court held a hearing and denied Kmart's motion, affirming its original findings in all respects.

In reviewing the tax court's valuation of the subject property,

[t]his court will not disturb the tax court's valuation of property for tax purposes unless the tax court's decision is clearly erroneous, which means the decision is not reasonably supported by the evidence as a whole. The tax court's decision should be considered clearly erroneous only when this court is left with a definite and firm conviction that a mistake has been committed. * * * The inexact nature of property assessment necessitates that this court defer to the decision of the tax court unless the tax court has either clearly overvalued or undervalued the subject property, or has completely failed to explain its reasoning.

*Equitable Life Assurance Soc'y of U.S. v. County of Ramsey*, 530 N.W.2d 544, 552 (Minn.1995) (citations and quotations omit-

1. Dahlen admitted at trial that his comparable property number 1 actually had a sales price per square foot of $40.88 rather than $44.67 as shown in his appraisal. After making adjustments but without correcting this error, his calculated "indicated value" for property number 1 was $46.78 per square foot. The corrected indicated value should be

$42.81 per square foot ($40.88 multiplied by ratio of $46.78 divided by $44.67).

2. Multiplying the tax court's value under this method of $2.4 million by the capitalization rate it used of 10.25% results in a net annual income amount of $246,000.

ted). We have also stated that "[t]he tax court [is] not bound to accept the valuation of either appraiser." *Am. Express Fin. Advisors, Inc. v. County of Carver,* 573 N.W.2d 651, 658 (Minn.1998).

Kmart argues that the tax court clearly erred in two ways. First, it argues that, because of the tax court's "express acceptance" of Leirness's 15% reduction in the value of comparable sales subject to a long-term lease, the tax court's reasoning was "illogical." Essentially, Kmart argues that the tax court was required to reduce the county's appraisal of $39 per square foot by 15%, resulting in a value of $33.15 per square foot. Kmart then argues that $33.15 per square foot must be the upper end of the range of permissible valuations of the property with Kmart's appraisal of $27 per square foot as the lower end of the range. Thus, Kmart argues that the tax court clearly erred when it found the value to be $35 per square foot—outside of the range argued by Kmart. Kmart also argues that the tax court was bound to use the same capitalization rate as used by Kmart's appraiser because the tax court's memorandum stated that it used "[Leirness's] capitalization rate of 10.25%." Kmart contends that because Leirness "unquestionably used a capitalization rate of 10.5% in his analysis," the tax court's "unexplained usage of a different, lower capitalization rate, represents a clearly erroneous finding."

The county argues that the evidence presented at trial supports the tax court's finding on both issues. It also argues that the tax court did not "expressly accept" Leirness's 15% downward leased fee adjustment and was not bound by it. Finally, it argues that Leirness "used" a capitalization rate of 10.25% under the "band of investment method" to determine his proposed capitalization rate of 10.5% that he

then "used" in determining the property's value.

The evidence amply supports the tax court's valuation. The tax court was presented with expert opinions on the value of the property. Kmart's appraiser valued it at $2.35 million. The county's appraiser valued it at $3.3 million. The tax court concluded that the value was $2,720,380—an amount more than $100,000 below the average of the two appraisals. Kmart essentially is asking this court to conclude that the tax court "completely failed to explain its reasoning," and therefore this court should not defer at all to the tax court's decision. *Equitable Life Assurance Soc'y of U.S.,* 530 N.W.2d at 552. The gist of Kmart's argument is that the words used by the tax court in its memorandum can *only* convey the meanings ascribed to them by Kmart. But the tax court explained its reasoning in a 12–page memorandum attached to its initial findings and rejected Kmart's argued meanings when it denied Kmart's motion for amended findings of fact.

 As to the amount of the leased fee adjustment, the county's expert, Dahlen, argued that there should be no negative percentage adjustment. The tax court determined that the county "did not provide clear and convincing evidence" for this argument. It then wrote: "Based upon the evidence presented, we accept [Leirness's] testimony that the leases were higher than the market rent and make adjustments for the leased fee nature of the comparable sales." Nowhere does the tax court make an "express acceptance" of Leirness's 15% adjustment, as Kmart claims; rather, it "made a reasonable adjustment based on the evidence." That is, the tax court arrived at a compromise adjustment after evaluating the testimony and other evidence provided by two experts. *See id.* at 558 ("When the tax court reconciles con-

flicting opinions of value and arrives at a compromise valuation, that compromise must have evidentiary support."). The tax court did not clearly err when it determined a comparable sales value of $35 per square foot.

 Kmart's argument with regard to the tax court's use of a capitalization rate of 10.25% appears to entirely depend upon what the meaning of "his" is. The tax court wrote: "We find [Leirness's] analysis persuasive and use his capitalization rate of 10.25%." Earlier in the same paragraph, the tax court noted that "Leirness used a rate of 10.5%," and consulted "other sources as a check of his use of a 10.5% capitalization rate." But the tax court also noted that Leirness "then used the band of investment method as a check, which reflected a capitalization rate of 10.25%." In the same paragraph where the tax court stated that Leirness "used" two different capitalization rates, and that Dahlen "used" a rate of 9.5%, the court decided to "use" the lower of two rates presented by Leirness—the lower of "his" two rates. When presented with this perceived inconsistency, the tax court affirmed that its decision to use a 10.25% capitalization rate was based on the "evidence and analyses presented," and denied Kmart's request to change the rate.

Kmart does not argue that its own appraiser's calculation of a 10.25% capitalization rate under the band of investment method was unsupported by the evidence. While the tax court could have been clearer as to why it chose the 10.25% rate, the tax court apparently concluded that the evidence best supported that rate. As the evidence provided by Kmart's own appraiser supports the use of that rate, the tax court did not clearly err in using it. *See id.* at 552 ("This court will not disturb the tax court's valuation of property for tax purposes unless the tax court's deci-

sion is clearly erroneous, which means the decision is not reasonably supported by the evidence as a whole.").

The tax court's valuation of the subject property is reasonably supported by the evidence as a whole, and we are not definitely and firmly convinced that a mistake has been committed.

Affirmed.

GILDEA, J., not having been a member of this court at the time of the argument and submission, took no part in the consideration or decision of this case.