**F–D OIL COMPANY, INC.,
et al., Relators,**

v.

**COMMISSIONER OF REVENUE,
Respondent.**

No. C1–96–1589.

Supreme Court of Minnesota.

March 27, 1997.

Mark A. Pridgeon, Edina, for Relators.

Hubert H. Humphrey, III, Minnesota State Attorney General, Thomas K. Overton, Assistant Attorney General, Tax Litigation Division, St Paul, for Respondent.

## OPINION

BLATZ, Justice.

Relators appeal a tax court judgment affirming orders of the Commissioner of Reve-

nue assessing additional income taxes and statutory fraud penalties against relators. The Minnesota Tax Court held that relators had the burden of proof regarding whether a fraud penalty should be assessed pursuant to Minn.Stat. § 289A.60, subd. 6 (1996) and held that the commissioner properly assessed both the additional income taxes and fraud penalties. We affirm.

In June 1994, the commissioner issued three orders assessing relators F–D Oil Company, John and Jill Fleming, and Robert and Mary Fries for unpaid Minnesota income taxes and assessing fraud penalties pursuant to Minn.Stat. § 289A.60, subd. 6. Relators filed notices of appeal with the Minnesota Tax Court. The tax court held an evidentiary hearing, after which it affirmed the commissioner's orders.

Fleming is the president and 50 percent shareholder of F–D Oil, a Minnesota corporation that operates a convenience store and automobile service station in South St. Paul, Minnesota. Fleming is also the president and shareholder of Fleming Fuel Stops (Normandale) which operates a service station on Normandale Boulevard in Bloomington, Minnesota. Fries began working at F–D Oil in 1975. In 1982, Fries purchased a portion of F–D Oil's stock and became its general manager.

In early 1992, based on informant information from a bookkeeper, the Internal Revenue Service and the Minnesota Department of Revenue (department) audited Normandale and uncovered a skimming scheme. The auditors discovered that Normandale's bookkeepers had charged customers one amount for labor as reflected on the work orders but entered a lesser amount for labor into the computerized record system. Using Normandale's work orders, the auditors concluded that approximately $30,000 per year in revenue was not reported at Normandale from 1987 through 1991.

In January 1994, upon completion of a criminal trial, Fleming was found guilty of a felony for skimming cash from Normandale. At his criminal trial, Fleming denied involvement in the skimming at Normandale, but, in his testimony before the tax court in this case, Fleming admitted that he directed the bookkeepers at Normandale to underreport labor income and give him the skimmed money.

After Fleming's conviction, the department began investigating F–D Oil because the bookkeepers at Normandale believed that skimming was also occurring at F–D Oil. The department did not have the assistance of any F–D Oil employees as informants. When the department subpoenaed F–D Oil's records in February 1994, F–D Oil produced only copies of customers' credit card receipts and daily reports. Daily reports are computer-generated financial records. F–D Oil did not produce any work orders for auto repairs. Using the credit card receipts, the department was able to locate some of F–D Oil's customers who had retained their copies of work orders. After comparing the customers' work orders to F–D Oil's daily reports, the department concluded that F–D Oil had underreported labor income in its daily reports in a manner that was similar to the skimming scheme proven at Normandale.

Based upon this conclusion, the commissioner estimated the amount of F–D Oil's unreported income and issued three orders. The commissioner issued one order assessing F–D Oil for tax years ending June 30, 1987 through June 30, 1992. Specifically, the commissioner assessed additional income tax, a fraud penalty equal to 50 percent of the additional tax, and interest, for a total of $65,031.75. The commissioner also issued two orders assessing additional income taxes, 50 percent fraud penalties, and interest, against Fleming and Fries, and their wives, for tax years ending December 31, 1987 through December 31, 1992.

At a 2–day evidentiary hearing before the tax court in this case, Fleming and Fries denied participating in skimming at F–D Oil and attributed the discrepancies to employee theft. Fries testified that he suspected theft at F–D Oil on several occasions. He testified that the convenience store profits "weren't up to where we thought they should have been" so a security camera was installed. Fleming testified that after the camera was put in, convenience store sales increased by $500 per month and profits on auto repairs

increased by about 5 percent. In support of the allegations of theft, Fleming testified that there were instances where the tow truck would show mileage driven without anything being rung on the cash register and that he suspected problems with employees because of shortages and missing inventory.

Margaret Anderson testified that she had worked as F–D Oil's bookkeeper since 1984. Anderson tracked the inventory of gasoline, cigarettes, oil, batteries, tires, and pop on a daily basis. She used the daily cash register tape, an inventory sheet, her personal notebook, credit card receipts, and work orders to create the computer-generated daily reports for F–D Oil. When Anderson took vacations, Fries would handle bank deposits, but all other work would await her return.

All of F–D Oil's transactions were rung into the cash register except for auto repairs. When a customer paid the cashier for auto repairs, the transaction was rung up as a "no sale" and therefore it was not reflected on the cash register tape. The cashier then gave the customer one copy of the work order. Two other copies of the work order were given to Anderson, who then entered data from the work order into the computer. After the computer entries were made, the remaining two copies were separated and placed into two files. One copy was placed in the mechanics file for one month and the other copy was placed in the customer file in case a customer raised questions about repair work or information was needed regarding warranties.

After the evidentiary hearing, the tax court affirmed the commissioner's orders assessing additional income taxes and fraud penalties. The tax court determined that Fleming and Fries engaged in a scheme to skim income from F–D Oil; that the amount assessed by the commissioner was reasonable; that relators had the burden of proof regarding the fraud penalty; and that relators did not meet their burden of proving that the fraud penalty did not apply.

The tax court's findings of fact supporting its decision included: the amounts for labor entered into F–D Oil's computer record system were lower than the amounts charged to customers; F–D Oil's accountant used the lower amounts in preparing F–D Oil's income tax returns; cash was skimmed at F–D Oil in the same manner as it was skimmed at Normandale; and the testimony of Fleming, Fries, and Anderson denying involvement in the skimming scheme at F–D Oil was not credible.

On appeal to this court, relators claim: (1) the evidence does not support the tax court's decision that Fleming and Fries engaged in a scheme to skim income from F–D Oil; (2) the tax court erred in holding that relators had the burden of proof regarding the fraud penalty; and (3) the evidence does not support imposition of the fraud penalty.

### I.

■ This court may review decisions of the tax court "on the ground that the tax court was without jurisdiction, that the order of the tax court was not justified by the evidence or was not in conformity with law, or that the tax court committed any other error of law." Minn.Stat. § 271.10, subd. 1 (1996). In reviewing whether the tax court's findings are justified by the evidence, this court reviews the record to determine whether there is sufficient evidence to support the decision. *Carlson v. Commissioner of Revenue*, 517 N.W.2d 48, 51 (Minn.1994). Conclusions of law, including interpretations of statutes, however, are subject to de novo review. *Id.; Green Giant v. Commissioner of Revenue*, 534 N.W.2d 710, 711 (Minn.1995).

As a result of the department's investigation, the commissioner concluded that Fleming and Fries had engaged in a scheme to skim income from F–D Oil. The commissioner's tax assessments are presumed to be valid and correctly determined and relators have the burden of demonstrating the incorrectness or invalidity of the commissioner's assessments. Minn.Stat. §§ 270.68, subd. 3 (1996); 289A.37, subd. 3 (1996).

■ After an evidentiary hearing, the tax court found that the commissioner had proven that Fleming and Fries engaged in such a skimming scheme. Relators contend that the evidence does not justify the tax court's decision because: (1) the discrepancies were the result of mistakes; (2) the discrepancies

were caused by employee theft; and (3) Fleming, Fries, and Anderson testified and denied involvement.[1]

First, relators contend that the tax court's finding that Fleming and Fries engaged in a skimming scheme is not supported by the evidence because the discrepancies at F–D Oil between labor charged and labor reported were different than the discrepancies at Normandale and were thus a result of mistakes. Rather than supporting relators' contention, however, a close examination of the discrepancies at F–D Oil supports the tax court's finding that there was a skimming scheme at F–D Oil.

By way of background, it was difficult for the commissioner to determine how much income was skimmed per day from F–D Oil because F–D Oil produced inadequate records. The department had to use F–D Oil's credit card slips to locate some of its customers because F–D Oil had destroyed its work orders. By locating F–D Oil's customers, the department was attempting to obtain copies of F–D Oil's work orders because work orders formed the basis for the department's case against Normandale. Some of the customers contacted had retained copies of F–D Oil work orders that set forth an amount paid for labor that exceeded the amount of labor income recorded in the daily reports.

The method of skimming employed at F–D Oil was strikingly similar to that employed at Normandale. While a comparison of the F–D Oil work orders with the daily reports demonstrates that the amount of labor income was underreported in every case, the amounts charged for parts was reported correctly in all but three cases and, even then, the difference was negligible. At Normandale, Fleming (or the bookkeepers working under Fleming's direction) underreported labor while correctly reporting the amount charged for parts. The discrepancies at F–D Oil and Normandale thus demonstrate a similar method of underreporting.

Not only was the method of skimming similar, but so were the amounts of unreported labor on the individual work orders. On every F–D Oil work order but one, labor income was underreported in an amount divisible by five. At F–D Oil, the amount of unreported labor ranged from $10 to about $100, with common alterations of $10, $15, or $50. At Normandale, the amount of underreported labor ranged from $5 to $100, with common alterations of $10, $20, and $50. This similar pattern supports the tax court's finding that the discrepancies were the result of skimming rather than mistakes.

Second, relators also argue that the discrepancies at F–D Oil were caused by employee theft. The tax court found this explanation "ridiculous." Fleming and Fries testified that they had been concerned about employee theft. Fries typically worked 12 hours per day at F–D Oil and was present during most of its business hours. He also reviewed all of the work orders on a daily basis. In addition, because the skimming scheme at F–D Oil was accomplished in the same manner as at Normandale, Fleming presumably should have been able to discover skimming by employees. It would be unlikely that an F–D Oil employee could have used the same scheme Fleming employed at Normandale without Fleming's knowledge.

More importantly, the method by which F–D Oil handled work orders demonstrates that the discrepancies were not a result of employee theft. To accomplish the skimming, one would need to control the computer entries. Only Anderson entered work orders into the computer and she took direction from Fleming and Fries. Neither Fleming nor Fries suspected Anderson of taking money from F–D Oil. Anderson testified that, although her computer entries were incorrect, she had no explanation for the discrepancies, and did not testify that anyone else had altered the work orders.

---

1. Based upon Anderson's testimony, relators also assert that F–D Oil's mechanics never complained about receiving the wrong commissions, thus labor was entered correctly into the computer. This assertion is unpersuasive because Anderson could have used the copies of work orders kept in the mechanics file to calculate commissions and because the tax court found that Anderson's testimony was not credible.

■ Finally, relators contend that the tax court's finding that Fleming and Fries engaged in a skimming scheme is not supported by the evidence because Fleming, Fries, and Anderson testified and denied involvement in such a scheme. This argument fails because the tax court found that their testimony was not credible. The tax court is in the best position to evaluate the credibility and sincerity of witnesses. *Manthey v. Commissioner of Revenue*, 468 N.W.2d 548, 550 (Minn.1991). Based upon the other evidence submitted in this case, the tax court could reasonably find that the testimony of Fleming, Fries, and Anderson was not credible.

The fact that F–D Oil destroyed its business records further supports the tax court's finding that Fleming and Fries engaged in a skimming scheme at F–D Oil. The timing of the destruction of F–D Oil's business records is suspicious and evinces an intent to destroy evidence of the skimming scheme. The audit of Normandale began in August 1992. A tax specialist with the department showed F–D Oil's accountant copies of altered Normandale work orders in late December 1992. In mid-January 1993, F–D Oil destroyed its work orders, including the records for late December 1992. Fries testified that this destruction was routine, but his testimony is questionable for four reasons. First, when the work orders were destroyed in mid-January 1993, some of the work orders were only a few weeks old. Second, although Anderson testified that work orders were removed from the customer file in January of each year to make room for new work orders, she testified that she assumed the old copies were retained. Third, the destruction appears to be at odds with F–D Oil's policy of keeping copies of work orders as proof of warranties on parts and labor. Fourth, it can be inferred from a former employee's testimony that records from prior years may have been destroyed in January 1993, indicating the destruction was not routine.

We conclude that there is sufficient evidence to support the tax court's determination that Fleming and Fries engaged in a skimming scheme at F–D Oil.

## II.

Having concluded that the tax court did not err in finding that Fleming and Fries engaged in a skimming scheme, we must next decide whether the tax court erred in finding that the commissioner's assessment of additional income tax was reasonable.

When F–D Oil failed to produce adequate business records during the investigation, the department looked to the records of Normandale for guidance in determining unreported income because F–D Oil and Normandale were similar businesses; they were owned in total, or in part, by Fleming; they had similar computer record systems; and the evidence of underreporting labor income appeared to be the same. Using information from the Normandale audit, the department computed the ratio of unreported labor to reported labor at Normandale for 1989 and applied that ratio to the reported labor at F–D Oil for each relevant year.

The department also used an alternative method to estimate F–D Oil's unreported income, using F–D Oil's daily reports and credit card receipts (the only records F–D Oil provided the department). This alternative method resulted in a substantially higher estimate of F–D Oil's unreported income. The commissioner used the first, more conservative, method in assessing F–D Oil's unreported income.

Relators contend that the commissioner improperly relied upon an indirect method of proof in determining the amount of unreported labor income. Relators cite only *Holland v. United States* in support of their assertion that indirect methods of proof are not favored in determining unreported income. 348 U.S. 121, 75 S.Ct. 127, 99 L.Ed. 150 (1954), *reh'g denied*, 348 U.S. 932, 75 S.Ct. 334, 99 L.Ed. 731 (1955). In *Holland*, the Supreme Court affirmed the government's use of a net worth method of proof to determine unreported income, but warned that such indirect methods of proof must be closely scrutinized in criminal cases, when the government must prove the taxpayer guilty beyond a reasonable doubt. *Id.* at 125–26, 130–31, 75 S.Ct. at 130–31, 132–33. The *Holland* court noted that indirect methods are typically used when the taxpayer's rec-

ords are inadequate. *Holland* is not persuasive in this civil case where the commissioner's assessment has prima facie validity and the use of an indirect method was necessary because F–D Oil produced inadequate business records.

■ Relators also contend that the commissioner improperly used the ratio from Normandale in estimating the amount of unreported labor income at F–D Oil because the scheme at Normandale differed from that at F–D Oil. We disagree. The application of the ratio from Normandale in estimating the amount skimmed from F–D Oil was reasonable in light of the similarities between the businesses and the skimming schemes, Fleming's role in both businesses, and the fact that the commissioner's options were limited because F–D Oil destroyed its work orders.

■ Relators further contend that the commissioner improperly assessed additional income tax through 1992. Relators assert that the skimming at Normandale ended in April 1991, when the informant bookkeeper ended her employment at Normandale and Fleming's daughter replaced her as the bookkeeper. Essentially, relators argue that the skimming at Normandale ended in April 1991 and thus it also ended at F–D Oil at that time. There is no reason to believe that, even if the skimming at Normandale ended in April 1991, it also stopped at F–D Oil. More importantly, F–D Oil's work orders reveal that the discrepancies in reported labor continued at F–D Oil through December 1992.

We conclude that the evidence supports the tax court's determination that the amount of additional income tax assessed was reasonable.

### III.

Having concluded that the tax court did not err in affirming the commissioner's assessment of additional income tax, we now must decide whether the tax court properly held that the relators had the burden of proof with respect to the fraud penalty and whether there was sufficient evidence to support the penalty's imposition.

■ "The legislature has the power to determine the standard of proof in a statutorily created cause of action." *State v. Alpine Air Prods.*, 500 N.W.2d 788, 790 (Minn.1993). Minnesota statutes provide that the commissioner's orders are presumed to be valid and correctly determined and the taxpayer has the burden of demonstrating the incorrectness or invalidity of the commissioner's orders. Minn.Stat. §§ 270.68, subd. 3; 289A.37, subd. 3 (1996). Placing the burden of proof on the taxpayer in civil tax cases is in accordance with the common law principle of placing the burden on the party who has particular knowledge of the relevant facts. *See* Leo P. Martinez, *Tax Collection and Populist Rhetoric: Shifting the Burden of Proof in Tax Cases*, 39 Hastings L.J. 239, 271–72 (1988). Placing the burden on the taxpayer serves two purposes: it minimizes the possibility that the taxpayer will destroy records and saves the government time and money because the taxpayer is responsible for examining and preparing its own records to meet the burden. *Id.* at 272.

The issue of whether the taxpayer or the commissioner has the burden of proof when a fraud penalty is assessed is an issue of first impression before this court. Several Minnesota statutes are applicable. Chapter 270 authorizes the commissioner to bring an action against a taxpayer for recovery of tax and penalties. Minn.Stat. § 270.68, subd. 1. Chapter 270 further provides, "The tax, as assessed by the commissioner, with any penalties included therein, shall be presumed to be valid and correctly determined and assessed, and the burden shall be upon the taxpayer to show its incorrectness or invalidity." *Id.* § 270.68, subd. 3.

Chapter 289A applies to income taxes administered by the commissioner. Section 289A.35 makes the commissioner responsible for examining returns and making investigations. *Id.* § 289A.35 (1996). When the commissioner determines that the amount of tax disclosed by a return is less than the amount determined by the commissioner, the commissioner shall issue an order of assessment to the taxpayer. *Id.* § 289A.37, subd. 1(a) (1996). The commissioner's assessment of tax "is prima facie correct and valid. The

taxpayer has the burden of establishing its incorrectness or invalidity in any related action or proceeding." *Id.* § 289A.37, subd. 3.

Chapter 289A also includes a section on civil penalties, containing 19 separate categories of penalties. *Id.* § 289A.60 (1996). The penalty for a false or fraudulent return (fraud penalty) provides that a person who "files a false or fraudulent return, or attempts in any manner to evade or defeat a tax or payment of tax" shall pay "a penalty equal to 50 percent of the tax, less amounts paid by the person on the basis of the false or fraudulent return, due for the period to which the return related." *Id.* § 289A.60, subd. 6. Only two of the 19 penalty categories, the penalty for frivolous returns and the penalty for promoting abusive tax shelters, specifically provide that the commissioner has the burden of proving the taxpayer is liable for the penalty. *Id.* § 289A.60, subds. 7 & 20. The other 17 penalty categories, including the fraud penalty, contain no language regarding the burden of proof.

■ The legislature enacted general provisions giving the taxpayer the burden of proving that tax and penalties assessed by the commissioner are incorrect. The legislature only included language shifting the burden of proof to the commissioner in penalty provisions involving frivolous returns and fraudulent tax shelters. By failing to mention the burden of proof in the fraud penalty provision, the legislature intended for the general provisions to apply.

Relators cite federal case law in support of their argument that the commissioner has the burden of proof with respect to the fraud penalty. Under federal law, the burden of proving fraud is placed on the federal government based upon federal statutes pertaining to the tax court or common law. *See* 26 U.S.C. § 7454(a) (1996); *Paddock v. United States*, 280 F.2d 563, 566–67 (2d Cir.1960). The federal statutes are inapplicable and the federal common law is unpersuasive because there are Minnesota statutes that address this issue.

Although there may be valid policy reasons for imposing the burden of proof on the state when fraud is at issue, this court must follow the clear mandate of Minnesota statutes.

The legislature is free to determine the burden of proof if it chooses. Minnesota statutes clearly provide that relators have the burden of proof regarding the fraud penalty, thus the tax court did not err.

## IV.

Having held that relators had the burden of proof regarding the fraud penalty, we must now decide whether the tax court erred in finding that relators failed to meet their burden. One who "files a false or fraudulent return, or attempts in any manner to evade or defeat a tax or payment of tax" shall pay a fraud penalty equal to 50 percent of the tax. Minn.Stat. § 289A.60, subd. 6.

The tax court made the following findings that support imposition of a fraud penalty in this case: relators underreported income by skimming; F–D Oil maintained two separate record systems for tracking of labor and inventory; work orders were rung into the cash register as "no sale" so no record was made on the cash register tape; Anderson entered a lower amount of labor into the computer record system than the amount charged to customers; F–D Oil's records were "manipulated"; the testimony of Anderson, Fleming, and Fries was "not credible" and their explanation of the discrepancies was "ridiculous"; and the commissioner's assessment was reasonable in light of the fact that F–D Oil's records were destroyed. The tax court's findings are supported by the documents and testimony in this case. Therefore, the tax court did not err in affirming the commissioner's assessment of the fraud penalties.

Affirmed.

ANDERSON, J., took no part in the consideration or decision of this case.