Terry LEWIS, Respondent,

v.

COUNTY OF HENNEPIN, Relator.

No. CX–00–1077.

Supreme Court of Minnesota.

March 22, 2001.

Amy Klobuchar, Hennepin County Atty., Mark Kapter Maher, Asst. Hennepin County Atty., Minneapolis, for relator.

Thomas R. Wilhelmy, Laurie J. Miller, Minneapolis, for respondent.

## OPINION

RUSSELL A. ANDERSON, Justice.

This case centers on the assessment value of a luxury "dream" home on an unusually configured piece of land in an exclusive Lake Minnetonka neighborhood. The Hennepin County assessor assigned an estimated market value to the property of $4.22 million for 1996 and $4.35 million for 1997 and respondent challenged both assessments under Minnesota Statutes Chapter 278. After determining the fair market value and applying results of a sales ratio study indicating overvaluation for tax purposes, the tax court reduced the assessor's estimated market value for the property to $3,227,000 for 1996 and to $3,244,500 for 1997. The county appealed. We affirm.

Respondent purchased a 4.2–acre lot along Lake Minnetonka in Wayzata in 1992 for $1.6 million. The seller, a neighbor, had purchased the lot for $1.9 million but encumbered it with a conservation easement before selling it to respondent. In 1993 and 1994, respondent constructed a 30,000–square–foot home on the lot at a cost of approximately $5 million.

Both the lot and the home are atypical residential real estate. The lot is approximately 1,000 feet deep and flag-shaped, with the driveway serving as the "flagpole" extending from the public street to the lake. The house sits on the broadest section or flag-shaped piece of the property, between the lake and the road. The property has 76 feet of lake frontage. The home has eight bedrooms, two kitchens, seven fireplaces, an elevator, a movie theater, a recording studio designed to make commercial quality recordings, a hair salon, a grill room and a swimming pool with a spa and sauna.

The county assessor placed an estimated market value on the property of $4,220,000 for tax year 1996, and $4,350,000 for tax year 1997. Respondent filed property tax

petitions challenging the valuations and the cases were consolidated for trial.

Trial to the tax court lasted five days and concluded in April 1999 but the tax court reopened the proceedings in June 1999 to allow additional testimony regarding a sales ratio study[1] for the 1996 assessment. Based on the results of the study, the court reduced the estimated market value to $3,227,000 for 1996 and to $3,244,500 for 1997 in findings of fact, conclusions of law, and order for judgment.

Meanwhile the county had learned that respondent was marketing the property and deposed respondent's real estate agent. At the county's request, the tax court stayed its previous order and allowed additional testimony regarding the marketing of the home. The additional testimony addressed the impact of the marketing and sale of the property on its 1996 and 1997 valuations. The testimony confirmed that respondent rejected a $6 million offer for the property in June 1999 and that respondent sold the property for $6.2 million in December 1999. The tax court denied the county's motion to amend the tax court's findings, conclusions of law and order for judgment based on the marketing and sale.

On appeal to this court, the county raises numerous challenges to the tax court's factual findings and legal conclusions, and also challenges the tax court's evidentiary ruling. First, the county argues that the tax court failed to give proper weight to the June 1999 cash offer and December 1999 sale price as material evidence of the value of the property in 1996 and 1997. Second, the county argues that the tax court failed to give sufficient weight to the cost approach for determining the value of the property. Third, the county argues, the tax court inappropriately reduced the property's 1996 market value because the sales ratio study on which the reduction was based was not adjusted for time.

Fourth, the county contends that the tax court failed to consider the county appraiser's analysis of sales of comparable properties. Fifth, the county argues that the tax court erred in valuing the land at the price respondent paid for it in 1992. Finally, the county argues that the tax court erred in admitting the appraisal report of a deceased appraiser.

 Because of the inexact nature of valuing property, this court defers to the tax court's decision unless the tax court clearly overvalued or undervalued the property or the tax court completely failed to explain its reasoning. *Equitable Life Assur. Soc. of U.S. v. County of Ramsey,* 530 N.W.2d 544, 552 (Minn.1995). Before we will overrule the tax court, we must conclude that the tax court's decision is clearly erroneous, that is, that the evidence as a whole does not reasonably support the decision. *Marquette Bank Nat'l Ass'n v. County of Hennepin,* 589 N.W.2d 301, 305 (Minn.1999). Before we will reverse, we also must be left with a definite and firm conviction that a mistake has been committed. *Id.*

Property is valued at its market value for tax purposes. Minn.Stat. § 273.11, subd. 1 (2000). Market value is "the usual selling price * * * which could be obtained at a private sale or an auction sale, if it is determined by the assessor that the price from the auction sale represents an arms length transaction." Minn.Stat. § 272.03, subd. 8 (2000).

 This court recognizes three traditional approaches to establish the market value of real estate. *Equitable Life,* 530 N.W.2d at 552. The first approach, market comparison, is based on market prices paid for comparable properties. The second approach, the cost approach, recognizes that an informed buyer will pay no more for property than the cost of new construction of identical property. The

---

1. A sales ratio study compares the sale prices of recently sold properties to their assessed values.

third approach, the income approach, is based on the income that the property would produce. *Lewis & Harris v. County of Hennepin*, 516 N.W.2d 177, 178 (Minn.1994).

■ Appraisers must consider all relevant factors, Minn.Stat. § 273.12 (2000), and whenever possible should use at least two approaches to determine market value. *Equitable Life*, 530 N.W.2d at 553. The three traditional valuation approaches, however, are neither exclusive nor mandated. *Northwest Racquet Swim & Health Clubs, Inc. v. County of Dakota*, 557 N.W.2d 582, 587 (Minn.1997). Rather, the particular facts of each case determine the priority and amount of weight accorded each approach. *Lewis & Harris*, 516 N.W.2d at 180.[2] Against these standards, we address the county's claims.

## A. 1999 Property Sale

■■ First, the county argues that the tax court should have given more weight to the rejected June 1999 $6 million cash offer and the December 1999 $6.2 million sale price as material evidence of the 1996 and 1997 valuations under the market comparison approach. The weight to be given particular evidence in a valuation determination is for the trier of fact. *See Alstores Realty, Inc. v. State*, 286 Minn. 343, 353, 176 N.W.2d 112, 118 (1970). The tax court stated that it consistently gives no weight to nonconsummated purchase agreements. *Niemi v. County of Carver*, Nos. C3–96–146 and C5–96–147, 1996 WL 685573, at *2 (Minn. T.C., Nov. 25, 1996). Such agreements are essentially offers to purchase, and represent one potential buyer's valuation of the property. The offer may be laden with contingencies or terms other than sale price that distort the monetary value of the offer. While under different facts we might rule otherwise, we do not consider the tax court's decision not to give weight to the nonconsummated pur-

chase agreement in this case to be an abuse of discretion. Therefore, we consider only whether the $6.2 million sale price was given proper weight in determining the property's value in 1996 and 1997.

■ Respondent's appraiser testified that because the sale occurred four and three years after the relevant assessment dates, it was too remote in time to be considered, although he did use a 1999 land sale as one of four comparables in appraising the value of respondent's land for 1996 and 1997. Respondent's appraiser also testified that the market had not changed between 1996 and April 1998 and that this sale marked an unanticipated change in the luxury home market on Lake Minnetonka. The county argues that, assuming no change in the market until April 1998, the record contains no evidence to support a 70 percent increase in the value for luxury homes on Lake Minnetonka between April 1998 and December 1999.

The tax court noted that one sale is not necessarily conclusive of value because "one sale does not make a market." The tax court explained that it was persuaded by the testimony of respondent's appraiser that the December 1999 sale represented an unanticipated market change, and the tax court is in the best position to evaluate the credibility of witnesses. *F–D Oil Co. v. Comm'r of Revenue*, 560 N.W.2d 701, 706 (Minn.1997). The tax court also explained that it generally gives little weight to sales remote in time to the valuation date. *See Huisken Meat Center, Inc. v. County of Murray*, Nos. C2–97–27 and C8–95–271, 1998 WL 15131, at *3 (Minn. T.C., Jan. 14, 1998). Likewise, we have considered the market comparison approach to be based on *recent* sales of similar property. *See, e.g., Northerly Centre Corp. v. County of Ramsey*, 311 Minn. 335, 338, 248 N.W.2d 923, 925, n. 2 (1976). We cannot say that the tax court clearly erred

---

2. For example, in this case neither party contends that the income approach is applicable, given that there is little or no rental market

for properties of this type. Accordingly, the tax court focused on the market comparison and cost approaches.

or completely failed to explain its reasoning when it determined under these particular facts that the December 1999 sale was too remote in time to be given much weight in determining the property's value in January 1996 and 1997. *See Marquette Bank*, 589 N.W.2d at 305.

### B. Cost Approach

■ Next, the county challenges the tax court's failure to explain both its finding of functional obsolescence in the property and why it rejected the cost approach, and its failure to reach a value under the cost approach. In effect, the county claims, the tax court rejected the cost approach. We disagree.

The tax court indicated that it considered the cost approach but judged it less reliable than the market comparison approach, as did the county's appraiser. The court noted that construction and land costs were disputed. The court also explained that potential purchasers have the means to build their own "dream" homes and are unwilling to pay the full construction cost of customized features that represent someone else's dream.

The tax court's discounting of the cost approach is consistent with accepted principles of appraisal. Luxury items in a home that exceed market requirements do not add to the property's value in an amount equal to their cost and, in fact, may reduce the property's value, creating functional obsolescence. Appraisal Institute, *The Appraisal of Real Estate* 390 (11th ed.1996). Functional obsolescence of luxury items is cured when they are removed, and doing so adds value to the property. *Id.* at 387.

The appraisers agreed that the luxury features in respondent's home became functionally obsolete, but disagreed as to the degree of functional obsolescence. Respondent's appraiser discounted the building replacement cost by 53 percent for functional obsolescence. He testified that this type of luxury home suffers "huge amounts" of depreciation and provided articles and examples of other luxury homes to support his testimony. In particular, respondent's appraiser noted that many people would not be willing to pay for a movie theater or recording studio in the home. Respondent's appraiser also testified that luxury homes suffer depreciation because the home is an "expression of ego" not fulfilled by buying another's home.

The county's appraiser discounted the building replacement cost by 35 percent, believing that the functional obsolescence in the property was curable.

The tax court recognized the difficulty in determining functional obsolescence, a conclusion supported by the appraisers' widely varying determinations, and explained that such difficulty rendered the cost approach less reliable. Where the tax court determined that the cost approach was of little reliability based in part on the variable determinations of functional obsolescence, the tax court was not required to determine or explain findings relative to functional obsolescence as the county demands.

Finally, the county offers no case law nor statutory support for its statement that the court should reach a valuation based on the cost approach. The tax court is not obligated to give the cost approach equal weight to any other approach; rather, the weight accorded each approach depends on the facts of each case. *Lewis & Harris*, 516 N.W.2d at 180.

We conclude that the court considered the cost approach and sufficiently explained why the cost approach was of little reliability, given the difficulty in determining the extent to which purchasers would pay for luxury features acknowledged to be functionally obsolete.

### C. Department of Revenue Sales Ratio Study

■ Next, the county argues that the tax court applied a sales ratio figure for 1996 that was not adjusted for time, as

required under Minn.Stat. § 278.05, subd. 4(b) (2000). Therefore, the county argues, the court erroneously adjusted the value of the subject property. The county does not challenge the sales ratio study for the 1997 assessment.

A sales ratio compares the sale prices of recently sold properties with the assessed value given those properties for tax purposes. Minn.Stat. § 270.12, subd. 2 (2000). The ratio is designed to measure how close assessments are to market value and to measure the inequality of assessment practices. *Id.* The Department of Revenue (DOR) conducts a sales ratio study that may be used as the basis to reduce property value under certain conditions. *Id.;* Minn.Stat. § 278.05, subd. 4 (2000). The tax court may grant a reduction in property value if (a) the study's sales prices are adjusted for the terms of the sale to reflect market value, (b) the sales prices are adjusted to reflect the difference between the date of sale and the date of assessment, (c) there is an adequate sample size and (d) the median ratio of sale price to assessed value of property of the same classification in the same tax district is lower than 90 percent. Minn.Stat. § 278.05, subd. 4.

In this case, the court determined that the subject property met the criteria for a reduction since the study included 51 sales in Wayzata and the median ratio was 87.2 percent for 1996. The tax court interpreted the statute to not require a time adjustment if the DOR does not report one. When the county claimed that the tax court applied a sales ratio figure that was not adjusted for time, the court agreed to hear testimony from a DOR senior research analyst supervisor.

The analyst testified that, at a 95–percent confidence level, the DOR did not find a statistically significant rate of inflation. The analyst did acknowledge that, at an 88 percent confidence level, the department found between 3½ and 4 percent inflation. The analyst did not recall using a confidence level of less than 90 percent when assessing inflation, however. In essence, the analyst's testimony supports the conclusion that there was no significant "difference in the date of sale compared to the assessment date." Minn.Stat. § 278.05, subd. 4. As such, the evidence reasonably supports the tax court's conclusion that a time adjustment to a sales ratio study was not appropriate where the DOR reported no statistically significant rate of inflation during the study period. The court explained its findings for each element necessary for a reduction in property value, including the time adjustment, under Minn.Stat. § 278.05, subd. 4. Therefore, the court's decision to reduce the property value based on the sales ratio study was not clearly erroneous. *See Marquette Bank,* 589 N.W.2d at 305.

### D. Market Comparison Study

■ The county next argues that where the tax court accepted, without modification, the testimony of respondent's appraiser regarding market comparisons, one is left with a firm conviction that a mistake was made. Both appraisers used the same two comparable sales in their analyses but varied in their adjustments to account for the differences between the comparable properties and respondent's property. Respondent's appraiser testified that respondent's property was inferior to the comparable properties. The county claims that the weight of the evidence, including its own appraiser's testimony and the testimony of a third appraiser, supports a finding that respondent's property was superior to the two comparable properties considered.

The court concluded that the adjustments made by respondent's appraiser more closely accounted for differences between the comparable properties and the subject property. In effect, the tax court simply found more creditable the analysis of respondent's appraiser. The tax court is in the best position to evaluate the credibility of witnesses. *F–D Oil,* 560 N.W.2d at 706. Where the tax court concluded that adjustments to market comparisons

made by one appraiser more closely accounted for differences in the properties, the tax court did not clearly err in accepting that appraiser's market comparison value.

### E. Land Value

■ The county argues that the tax court erred by failing to explain its finding that that scarce lakeshore property in an exclusive neighborhood did not increase in value from the $1.6 million sale price in the four and five years between purchase and valuation. We disagree.

■ The tax court explained in the memorandum attached to its order that respondent's appraiser better accounted for the unique qualities that decreased the value of the property: the relatively small lakeshore frontage, the irregular shape of the property and the conservation easement restricting use of the property. Respondent's appraiser concluded that respondent paid too much for the land. Where the tax court credited one appraiser's explanation for the consistent value of the land, we cannot say that the evidence as a whole fails to reasonably support the decision or that the court failed to explain its reasoning. *See Equitable Life*, 530 N.W.2d at 552.

### F. Deceased Appraiser's Report

■ The county argues that the tax court erred by admitting into evidence a deceased appraiser's report, which was appended to the report of respondent's appraiser and which the county claims is hearsay. The tax court's evidentiary ruling will not be disturbed absent legal error or abuse of discretion. *Marquette Bank*, 589 N.W.2d at 307.

An expert may base his or her opinion on facts or data that the expert perceived or that were made known to the expert at or before the hearing. Minn. R. Evid. 703(a). If the expert reasonably relies on those facts or data to form opinions or inferences, the facts or data need not be admissible as evidence. *Id.* Respondent's appraiser testified that he relied on the deceased appraiser's report for building size, land layout and the report's role in a "real life transaction," as a bank relied on the deceased appraiser's report to evaluate financing in 1994. Because the deceased appraiser's report was offered for a purpose consistent with Rule 703(a), we conclude that the tax court did not abuse its discretion in admitting the report into evidence as part of respondent's appraiser's report.

■ Even if the county had demonstrated that the tax court abused its discretion in admitting the report, we do not find the evidentiary ruling unfairly prejudiced the county. *See Marquette*, 589 N.W.2d at 307 (holding that even if evidence admitted in error, admission must result in material prejudice to warrant reversal). The report is mentioned briefly in a footnote to the tax court's original order as one of five appraisals that the court considered. The court also explained that the deceased appraiser did not testify and that his report was only an attachment to the report of respondent's appraiser. The court also noted that respondent's appraiser had prepared an earlier, independent appraisal that provided the same valuation as the appraisal that included the deceased appraiser's report. Thus, the tax court placed little, if any, reliance on the deceased appraiser's report and the county was not unfairly prejudiced by the evidentiary ruling.

In sum, we hold the tax court's decision is not clearly erroneous because the record includes evidence that reasonably supports the tax court's conclusions and because the tax court explained its reasoning in reaching its valuation.

Affirmed.